APPEAL,JURY,TYPE–L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:20–cv–01515–JMC</u>
### *Internal Use Only*

| | |
|---|---|
| ALSTON v. DISTRICT OF COLUMBIA et al | Date Filed: 06/10/2020 |
| Assigned to: Judge Jia M. Cobb | Jury Demand: Plaintiff |
| Demand: $100,000,000 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **KENITHIA ALSTON**<br>*Individually and as Special*<br>*Administrator of the Estate of Mr.*<br>*Marqueese Alston* | represented by | **Alexander David Afnan**<br>GEORGETOWN UNIVERSITY LAW<br>CENTER<br>600 New Jersey Avenue NW<br>Suite 352<br>Washington, DC 20010<br>202–867–7750<br>Email: <u>aa2114@georgetown.edu</u><br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Marissa Hatton**
GEORGETOWN LAW CIVIL RIGHTS
CLINIC
600 New Jersey Avenue NW
Suite 352
Washington, DC 20001
858–382–1209
Email: <u>marissa.hatton@georgetown.edu</u>
*TERMINATED: 10/30/2024*
*ATTORNEY TO BE NOTICED*

**Zina Makar**
600 New Jersey Ave NW
Suite 352
Washington, DC 20001
202–661–6506
Email: <u>zina.makar@georgetown.edu</u>
*TERMINATED: 10/30/2024*
*ATTORNEY TO BE NOTICED*

**Aderson Bellegarde Francois**
GEORGETOWN UNIVERSITY LAW
CENTER
Civil Rights Clinic
600 New Jersey Avenue, NW
Suite 352
Washington, DC 20001

1

(202) 661–6721
Fax: 202–662–9634
Email: aderson.francois@georgetown.edu
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**                     represented by     **Kerslyn D. Featherstone**
OFFICE OF ATTORNEY GENERAL/DC
Public Interest Division/Civil Enforcement
Section
400 6th Street NW
Washington, DC 20001
(202) 724–6600
Fax: (202) 741–8924
Email: kerslyn.featherstone@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michelle Guyette Hersh**
OFFICE OF THE ATTORNEY
GENERAL FOR D.C.
Civil Litigation Division
400 6th Street, NW
Washington, DC 20001
(202) 807–0360
Fax: (202) 741–8982
Email: michelle.hersh@dc.gov
*TERMINATED: 01/25/2021*
*LEAD ATTORNEY*

**David B. Jastrab**
DC OFFICE OF THE ATTORNEY
GENERAL
400 Sixth Street NW
Washington, DC 20001
202–309–8882
Email: david.jastrab@dc.gov
*ATTORNEY TO BE NOTICED*

**Matthew Dennis Trout**
DC OAG
Civil Division
400 Sixth Street, NW
Washington, DC 20001
(202) 724–5695
Fax: (202) 724–6590
Email: matthew.trout1@dc.gov
*TERMINATED: 05/05/2023*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICERS X, Y, A, and Z**
*In their individual and official capacities*

**Defendant**

| | | |
|---|---|---|
| **RONALD KOCH** | represented by | **Kerslyn D. Featherstone** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Michelle Guyette Hersh** |
| | | (See above for address) |
| | | *TERMINATED: 01/25/2021* |
| | | *LEAD ATTORNEY* |
| | | |
| | | **David B. Jastrab** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **CALEB DEMERITT** | represented by | **Kerslyn D. Featherstone** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Michelle Guyette Hersh** |
| | | (See above for address) |
| | | *TERMINATED: 01/25/2021* |
| | | *LEAD ATTORNEY* |
| | | |
| | | **David B. Jastrab** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 06/10/2020 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number ADCDC–7215037) filed by KENITHIA ALSTON. (Attachments: # 1 Civil Cover Sheet)(Francois, Aderson) (Entered: 06/10/2020) |
| 06/11/2020 | 2 | ERRATA *Civil Cover Sheet* by KENITHIA ALSTON 1 Complaint filed by KENITHIA ALSTON. (Francois, Aderson) (Entered: 06/11/2020) |
| 06/11/2020 | | Case Assigned to Judge Ketanji Brown Jackson. (adh, ) (Entered: 06/11/2020) |
| 06/11/2020 | | SUMMONS Not Issued as to DISTRICT OF COLUMBIA, OFFICERS X, Y, A, and Z (adh, ) (Entered: 06/11/2020) |
| 06/12/2020 | 3 | REQUEST FOR SUMMONS TO ISSUE re 1 Complaint filed by KENITHIA ALSTON. Related document: 1 Complaint filed by KENITHIA ALSTON. (Attachments: # 1 Summons Request for Summons to Issue)(Francois, Aderson) |

|  |  | (Entered: 06/12/2020) |
|---|---|---|
| 06/15/2020 | 4 | SUMMONS (2) Issued Electronically as to DISTRICT OF COLUMBIA, District of Columbia Attorney General, and the District of Columbia Mayor. (zjf) (Entered: 06/15/2020) |
| 07/06/2020 | 5 | GENERAL ORDER AND GUIDELINES FOR CIVIL CASES BEFORE JUDGE KETANJI BROWN JACKSON. The Court will hold the parties and counsel responsible for following these directives, and parties and counsel should pay particular attention to the Court's instructions for briefing motions and filing exhibits. Failure to adhere to this Order may, when appropriate, result the imposition of sanctions and/or sua sponte denial of non–conforming motions. Signed by Judge Ketanji Brown Jackson on 7/6/2020. (jag) (Entered: 07/06/2020) |
| 08/05/2020 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 7/24/2020. Answer due for ALL D.C. DEFENDANTS by 8/19/2020. (Attachments: # 1 Exhibit Proof of Service)(Francois, Aderson) Modified on 8/5/2020 to correct served/answer due date (zjf). (Entered: 08/05/2020) |
| 08/14/2020 | 7 | MOTION to Dismiss by DISTRICT OF COLUMBIA (Trout, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 8 | NOTICE of Appearance by Kerslyn D. Featherstone on behalf of DISTRICT OF COLUMBIA (Featherstone, Kerslyn) (Entered: 08/14/2020) |
| 08/27/2020 | 9 | AMENDED COMPLAINT against All Defendants with Jury Demand filed by KENITHIA ALSTON.(Francois, Aderson) (Entered: 08/27/2020) |
| 09/01/2020 | 10 | NOTICE of Appearance by Michelle Guyette Hersh on behalf of DISTRICT OF COLUMBIA (Hersh, Michelle) (Entered: 09/01/2020) |
| 09/02/2020 | 11 | Notice of Filing Redline Version re 9 AMENDED COMPLAINT filed by KENITHIA ALSTON.(Francois, Aderson) Modified on 9/3/2020 to correct docket event/text/link (zjf). (Entered: 09/02/2020) |
| 09/02/2020 |  | MINUTE ORDER denying without prejudice 7 Motion to Dismiss in light of Plaintiff's Amended Complaint. Signed by Judge Ketanji Brown Jackson on 9/2/2020. (jag) (Entered: 09/02/2020) |
| 09/04/2020 | 12 | NOTICE of Change of Address by Matthew Dennis Trout (Trout, Matthew) (Entered: 09/04/2020) |
| 09/04/2020 | 13 | Unopposed MOTION for Extension of Time to *Answer or Otherwise Respond to the Amended Complaint* by DISTRICT OF COLUMBIA (Hersh, Michelle) (Entered: 09/04/2020) |
| 09/04/2020 |  | MINUTE ORDER granting 13 Motion for Extension of Time to Answer Amended Complaint. It is hereby ORDERED that the District of Columbia shall answer or otherwise respond to the Amended Complaint on or before 10/13/2020. Signed by Judge Ketanji Brown Jackson on 9/4/2020. (jag) (Entered: 09/04/2020) |
| 09/04/2020 |  | Set/Reset Deadlines: Answer to the amended complaint due by 10/13/2020, (hs) (Entered: 09/04/2020) |
| 09/10/2020 | 14 | REQUEST FOR SUMMONS TO ISSUE re 9 Amended Complaint filed by KENITHIA ALSTON. Related document: 9 Amended Complaint filed by KENITHIA |

| | | ALSTON. (Attachments: # <u>1</u> Summons)(Francois, Aderson) (Entered: 09/10/2020) |
|---|---|---|
| 09/13/2020 | <u>15</u> | SUMMONS (2) Issued Electronically as to CALEB DEMERITT, RONALD KOCH. (zjf) (Entered: 09/13/2020) |
| 09/16/2020 | <u>16</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CALEB DEMERITT served on 9/16/2020, answer due 10/7/2020; RONALD KOCH served on 9/16/2020, answer due 10/7/2020 (Attachments: # <u>1</u> Summons Proof of Service)(Francois, Aderson) (Entered: 09/16/2020) |
| 10/05/2020 | <u>17</u> | Unopposed MOTION for Extension of Time to *Answer or Otherwise Respond to the Amended Complaint* by CALEB DEMERITT, RONALD KOCH (Hersh, Michelle) (Entered: 10/05/2020) |
| 10/13/2020 | <u>18</u> | MOTION to Dismiss *Amended Complaint* by DISTRICT OF COLUMBIA (Featherstone, Kerslyn) (Entered: 10/13/2020) |
| 10/14/2020 | | MINUTE ORDER granting, for good cause shown, <u>17</u> Unopposed Motion for Extension of Time to Answer. It is hereby ORDERED that Officers Demeritt and Koch shall answer or otherwise respond to the amended complaint on or before 11/4/2020. Signed by Judge Ketanji Brown Jackson on 10/14/2020. (jag (Entered: 10/14/2020) |
| 10/23/2020 | <u>19</u> | Consent MOTION for Extension of Time to File Response/Reply as to <u>18</u> MOTION to Dismiss *Amended Complaint* by KENITHIA ALSTON (Francois, Aderson) (Entered: 10/23/2020) |
| 10/23/2020 | <u>20</u> | Consent MOTION for Extension of Time to File Response/Reply as to <u>18</u> MOTION to Dismiss *Amended Complaint Corrected* by KENITHIA ALSTON (Francois, Aderson) (Entered: 10/23/2020) |
| 10/23/2020 | | MINUTE ORDER granting, for good cause shown, <u>18</u> , <u>19</u> Unopposed Motion for Extension of Time to File Response re <u>18</u> Motion to Dismiss Amended Complaint. It is hereby ORDERED that Plaintiff's response to the motion to dismiss is due on or before 11/8/2020. Signed by Judge Ketanji Brown Jackson on 10/23/2020. (jag) (Entered: 10/23/2020) |
| 11/04/2020 | <u>21</u> | MOTION to Dismiss *Amended Complaint* by CALEB DEMERITT, RONALD KOCH (Featherstone, Kerslyn) (Entered: 11/04/2020) |
| 11/08/2020 | <u>22</u> | Memorandum in opposition to re <u>18</u> MOTION to Dismiss *Amended Complaint* filed by KENITHIA ALSTON. (Francois, Aderson) (Entered: 11/08/2020) |
| 11/12/2020 | <u>23</u> | Consent MOTION for Extension of Time to File Response/Reply as to <u>18</u> MOTION to Dismiss *Amended Complaint* by DISTRICT OF COLUMBIA (Featherstone, Kerslyn) (Entered: 11/12/2020) |
| 11/14/2020 | <u>24</u> | WITHDRAWN PURSUANT TO DOCKET ENTRY <u>26</u> NOTICE OF WITHDRAWAL.....Consent MOTION for Extension of Time to File Response/Reply as to <u>21</u> MOTION to Dismiss *Amended Complaint* by KENITHIA ALSTON (Francois, Aderson) Modified on 11/19/2020 (zjf). (Entered: 11/14/2020) |
| 11/18/2020 | <u>25</u> | Memorandum in opposition to re <u>21</u> MOTION to Dismiss *Amended Complaint by Officers Caleb Demeritt and Ronald Koch* filed by KENITHIA ALSTON. (Francois, Aderson) (Entered: 11/18/2020) |
| 11/18/2020 | <u>26</u> | NOTICE OF WITHDRAWAL OF MOTION by KENITHIA ALSTON re <u>24</u> Consent MOTION for Extension of Time to File Response/Reply as to <u>21</u> MOTION to Dismiss |

| | | |
|---|---|---|
| | | *Amended Complaint* (Francois, Aderson) (Entered: 11/18/2020) |
| 11/20/2020 | | MINUTE ORDER granting, for good cause shown, 23 Consent Motion for Extension of Time to File Reply re 18 Motion to Dismiss Amended Complaint, nunc pro tunc. It is hereby ORDERED that the District of Columbia shall file its reply in support of its motion to dismiss on or before 11/23/2020. Signed by Judge Ketanji Brown Jackson on 11/20/2020. (jag) (Entered: 11/20/2020) |
| 11/23/2020 | 27 | REPLY to opposition to motion re 18 MOTION to Dismiss *Amended Complaint* filed by DISTRICT OF COLUMBIA. (Featherstone, Kerslyn) (Entered: 11/23/2020) |
| 11/25/2020 | 28 | REPLY to opposition to motion re 21 MOTION to Dismiss *Amended Complaint* filed by CALEB DEMERITT, RONALD KOCH. (Hersh, Michelle) (Entered: 11/25/2020) |
| 12/03/2020 | 29 | Consent MOTION for Leave to File *Table of Contents and Authorities to Their Motion to Dismiss and to Exceed Page Limit for Replies* by CALEB DEMERITT, RONALD KOCH (Hersh, Michelle) (Entered: 12/03/2020) |
| 12/03/2020 | 30 | Consent MOTION for Leave to File *Late* by DISTRICT OF COLUMBIA (Featherstone, Kerslyn) (Entered: 12/03/2020) |
| 12/18/2020 | | MINUTE ORDER granting 29 Motion for Leave to File Table of Contents and Authorities to Their Motion to Dismiss and to Exceed Page Limit for Replies and 30 Motion for Leave to File Late. Signed by Judge Ketanji Brown Jackson on 12/18/2020. (jag) (Entered: 12/18/2020) |
| 12/18/2020 | 31 | MOTION to Dismiss by CALEB DEMERITT, RONALD KOCH (Featherstone, Kerslyn) (Entered: 12/18/2020) |
| 12/18/2020 | 32 | MOTION to Dismiss by DISTRICT OF COLUMBIA (Featherstone, Kerslyn) (Entered: 12/18/2020) |
| 01/25/2021 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CALEB DEMERITT, DISTRICT OF COLUMBIA, RONALD KOCH. Attorney Michelle Guyette Hersh terminated. (Hersh, Michelle) (Entered: 01/25/2021) |
| 03/04/2021 | 34 | NOTICE of Appearance by Zina Makar on behalf of KENITHIA ALSTON (Makar, Zina) (Entered: 03/04/2021) |
| 06/29/2021 | | Judge Ketanji Brown Jackson has been elevated to serve on the U.S. Court of Appeals for the D.C. Circuit. She is therefore no longer assigned to this case, and this matter has been reassigned to the Calendar Committee, which will oversee it until it is assigned to another district judge. Any questions should be directed to Judge Jackson's former deputy clerk, Gwendolyn Franklin, at 202–354–3145 or gwen_franklin@dcd.uscourts.gov. (rj) (Entered: 06/29/2021) |
| 11/03/2021 | 35 | NOTICE OF SUPPLEMENTAL AUTHORITY by CALEB DEMERITT, RONALD KOCH (Trout, Matthew) (Entered: 11/03/2021) |
| 11/15/2021 | | Case directly reassigned to Judge Jia M. Cobb. Judge Ketanji Brown Jackson has been appointed to the D.C. Circuit and is no longer assigned to the case. (rj) (Entered: 11/15/2021) |
| 11/29/2021 | 36 | RESPONSE re 35 NOTICE OF SUPPLEMENTAL AUTHORITY filed by KENITHIA ALSTON. (Francois, Aderson) (Entered: 11/29/2021) |
| 08/22/2022 | 37 | |

| | | |
|---|---|---|
| | | NOTICE of Appearance by Marissa Hatton on behalf of KENITHIA ALSTON (Hatton, Marissa) (Entered: 08/22/2022) |
| 05/05/2023 | 38 | NOTICE OF WITHDRAWAL OF APPEARANCE as to CALEB DEMERITT, DISTRICT OF COLUMBIA, RONALD KOCH. Attorney Matthew Dennis Trout terminated. (Trout, Matthew) (Entered: 05/05/2023) |
| 10/30/2024 | 39 | NOTICE OF SUBSTITUTION OF COUNSEL by Alexander David Afnan on behalf of KENITHIA ALSTON Substituting for attorney Zina Makar; Marissa Hatton (Afnan, Alexander) (Entered: 10/30/2024) |
| 03/24/2025 | 40 | MEMORANDUM OPINION & ORDER granting in part and denying in part 31 Defendants Caleb Demeritt and Ronald Koch's motion to dismiss and 32 Defendant District of Columbia's motion to dismiss. See document for details. Signed by Judge Jia M. Cobb on March 24, 2025. (lcjmc2) (Entered: 03/24/2025) |
| 03/24/2025 | | MINUTE ORDER setting Initial Scheduling Conference: The Court ORDERS that the Parties shall appear for an initial scheduling conference on April 22, 2025 at 11:00 AM. The conference will be on the record before Judge Jia M. Cobb and conducted via Zoom. The Court's Deputy Clerk will provide the information necessary to access the call. The Parties shall file a joint report pursuant to Local Civil Rule 16.3(d) and Federal Rule of Civil Procedure 26(f)(2) by April 15, 2025. Signed by Judge Jia M. Cobb on March 24, 2025. (lcjmc2) (Entered: 03/24/2025) |
| 04/04/2025 | 41 | Consent MOTION for Extension of Time to File Answer by DISTRICT OF COLUMBIA, RONALD KOCH, CALEB DEMERITT. (Jastrab, David) (Entered: 04/04/2025) |
| 04/07/2025 | | MINUTE ORDER granting 41 Consent Motion for Extension of Time: Having considered the motion, and for good cause shown, the Court GRANTS the motion. It is further ORDERED that Defendants shall file their answer by April 28, 2025 and the parties shall file a joint report pursuant to Local Civil Rule 16.3(d) and Federal Rule of Civil Procedure 26(f)(2) by May 6, 2025. The Court ORDERS that the Parties shall appear for an initial scheduling conference on May 16, 2025 at 11:00 AM. The conference will be on the record before Judge Jia M. Cobb and conducted via Zoom. The Court's Deputy Clerk will provide the information necessary to access the call. Signed by Judge Jia M. Cobb on April 7, 2025. (lcjmc2) (Entered: 04/07/2025) |
| 04/22/2025 | 42 | NOTICE OF APPEAL TO DC CIRCUIT COURT by RONALD KOCH, CALEB DEMERITT. Fee Status: No Fee Paid. Parties have been notified. (Jastrab, David) (Entered: 04/22/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

KENITHIA ALSTON, individually and
as Special Administrator to the Estate of
Marqueese Alston,

      *Plaintiff,*

    v.

DISTRICT OF COLUMBIA, *et al.,*

      *Defendants.*

20-cv-1515 (JMC)

## DEFENDANTS METROPOLITAN POLICE DEPARTMENT
## OFFICERS CALEB DEMERITT AND RONALD KOCH'S NOTICE OF APPEAL

    Please take notice that Defendants Metropolitan Police Department Officers Caleb

Demeritt and Ronald Koch hereby appeal to the U.S. Court of Appeals for the District of

Columbia Circuit this Court's March 24, 2025 Order partially denying Defendants' Motion to

Dismiss [40].

Date: April 22, 2025           Respectfully submitted,

                      BRIAN L. SCHWALB
                      Attorney General for the District of Columbia

                      CHAD COPELAND
                      Deputy Attorney General
                      Civil Litigation Division

                      */s/ Steven N. Rubenstein*
                      STEVEN N. RUBENSTEIN [1013094]
                      Chief, Civil Litigation Division Section V

                      */s/ David B. Jastrab*
                      DAVID B. JASTRAB [1048299]
                      AARON FINKHOUSEN [1010044]
                      Assistant Attorneys General
                      400 Sixth Street NW

Washington, D.C. 20001
(202) 309-8882
david.jastrab@dc.gov

*Counsel for Defendants*

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KENITHIA ALSTON,

                Plaintiff,

      v.

DISTRICT OF COLUMBIA, *et al.*,

            Defendants.

Case No. 20-cv-1515 (JMC)

## <u>MEMORANDUM OPINION AND ORDER</u>

Marqueese Alston was shot and killed by D.C. Metropolitan Police Department (MPD) officers. Mr. Alston's mother, Plaintiff Kenithia Alston, brings suit against Defendants District of Columbia, Officer Caleb Demeritt, Officer Ronald Koch, and other unnamed officers, asserting a variety of constitutional and common-law claims on behalf of her son's estate and on her own behalf. ECF 9.[1] Defendants move to dismiss Ms. Alston's suit pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 31; ECF 32.

The parties tell competing stories about the events leading up to Marqueese Alston's tragic death. The first story (from Ms. Alston): MPD targeted an unarmed, twenty-two-year-old Black man who was doing nothing more than standing on the street with a group of friends. ECF 9 at 1; *id.* ¶¶ 1, 109. Officers (one of whom had been scrolling on Instagram mere moments before) conducted a "jump-out": "a controversial shock-and-awe tactic," *id.* at 1–2, in which officers "suddenly emerge from a car and descend upon a single suspect or group on the street, often with

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

the goal of surprising them in order to search and potentially detain them." *Id.* ¶ 66. Officers leapt from their vehicles and chased Mr. Alston into an alley without identifying themselves or giving him any instructions. *Id.* ¶¶ 12, 15. As he ran, Mr. Alston turned briefly towards the officers as if to stop and then turned back around. *Id.* ¶ 16. Without any reasonable basis to believe Mr. Alston was armed, officers shot Mr. Alston twelve to eighteen times—even after he had fallen to the ground. *Id.*; *see* ECF 25 at 22–23. According to Ms. Alston, although a still image later obtained from video footage of the incident shows an indiscernible "thin black object" that is "the approximate size of a cell phone" in Mr. Alston's hand, the object does not look like (and was not) a gun. ECF 9 ¶¶ 42, 58–60. The second story (from Defendants): MPD officers legitimately pursued Mr. Alston because they saw "the outline of a gun and the trigger through [his] pants." ECF 31 at 24. Mr. Alston fled, and the officers ran after him into the alley. *Id.* at 10. Mr. Alston turned back towards the officers, holding a gun in his right hand. *Id.* at 27. Gunfire rang out. *Id.* at 17. Officers, reasonably believing that Mr. Alston posed an immediate threat to their safety and the safety of others, shot and killed him. *Id.* at 18. According to Defendants, the still photograph shows Mr. Alston holding a gun in his hand before officers shot him. ECF 28 at 13.

It is not the Court's job to determine which of these competing stories is true, particularly at this stage of the case. On a motion to dismiss, the Court must take Ms. Alston's factual allegations as true and consider only whether her version of the story amounts to a plausible legal claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). After doing so, and for the reasons set out below, Defendants' motions shall be **DENIED IN PART** and **GRANTED IN PART**. Ms. Alston's Fourth Amendment claims against the officers (Counts 1–4) and the District (Counts 7–8) may proceed to discovery. Her claims for assault and battery brought under D.C.'s Wrongful Death Act (Counts 11 and 13), her negligence claims on behalf of Mr. Alston (Counts 17

2

and 23–24), and her negligent supervision, retention, and training claims against the District (Counts 19–22) may also proceed. The Court will dismiss Ms. Alston's Fifth Amendment claims (Counts 5–6) because they merge with her Fourth Amendment claims, and any claims brought under the Fourteenth Amendment (Counts 5–8, in part) which do not apply to the District of Columbia. Additionally, the Court will dismiss Ms. Alston's claim that she was unconstitutionally deprived of access to the courts (Counts 9–10), because she has conceded it. The Court will also dismiss Ms. Alston's intentional tort claims brought under D.C.'s Survivorship Act (Counts 12, 14, and 15) as untimely; her tort claims brought against the District on her own behalf (Counts 16 and 18) for failure to comply with D.C.'s notice requirement; her intentional infliction of emotional distress claim brought against Officers Koch and Demeritt on her own behalf (Count 16) for failure to state a claim; and her negligent supervision, retention, and training claims brought against Officers Koch and Demeritt (Counts 19–22) for failure to state a claim.

## I.    BACKGROUND

The Court draws the following facts from the well-pled allegations in the complaint. On June 12, 2018, Mr. Alston was talking on his cell phone and speaking with a group of friends on the 3700 block of First Street Southeast, a residential neighborhood in Ward 8 of the District of Columbia. ECF 9 ¶¶ 12, 34, 109, 112. At least six police officers in two patrol cars approached in their vehicles. *Id.* ¶¶ 12, 15. Without activating police lights or sirens, and for no lawful reason, at least two officers—Caleb Demeritt and Ronald Koch—jumped out of their vehicles and sprinted towards Mr. Alston, who began running away.[2] *Id.* ¶¶ 15–16, 112. (One of those officers had been scrolling through Instagram just moments before. *Id.* ¶ 13.) The officers never identified

---

[2] The complaint refers to "Officers X and Y," *see* ECF 9, whom Defendants identify as Officers Demeritt and Koch, *see* ECF 31 at 13. The Court will use those names for ease of reference.

themselves or provided Mr. Alston with any directives or commands, *id.* ¶ 15—they just started chasing him.

Mid-pursuit, Mr. Alston "started to stop and turned to face" the officers, then turned forward again. *Id.* ¶ 16. A purported still image from body-worn camera (BWC) footage of that split-second in time "appears to show Mr. Alston with a thin black object in his hand." *Id.* ¶ 58. According to the complaint, that object was "the approximate size of a cell phone," but did not look like (and was not) a gun. *Id.* ¶ 60. Officers Demeritt and Koch then shot Mr. Alston "between twelve and eighteen times, including after he had already fallen to the ground." *Id.* ¶ 16.

Officers on the scene did not provide first-aid services or even try to determine whether Mr. Alston was alive. *Id.* ¶ 17. Medical responders would not arrive for over an hour—and when they did arrive, they simply pronounced Mr. Alston dead. *Id.* ¶ 18. Officers left Mr. Alston's body on the scene for several hours as a crowd of onlookers gathered. *Id.* ¶ 19.

According to Ms. Alston, her son's death was not an isolated incident, but was instead the predictable result of the MPD's practice of using "jump-outs" to unlawfully seize certain residents. As Ms. Alston alleges, a "jump-out" is "a controversial shock-and-awe tactic meant to intimidate and terrorize citizens into compliance," ECF 9 at 2, that often involves the use of excessive force against its targets, *id.* ¶ 131. Specifically, according to the complaint, a jump-out is a "paramilitary operation" in which multiple armed officers "suddenly emerge from a car and descend upon a single suspect or group on the street, often with the goal of surprising them in order to search and potentially detain them if something illegal can be recovered." *Id.* ¶ 66. Per Ms. Alston, "[t]he terror of MPD jump-outs is well known to residents of Ward 8," and "residents report that they remain ubiquitous in certain areas of the city." *Id.* Ms. Alston contends that the District is well

aware that its officers frequently engage in this unlawful conduct, and the practice has even been the subject of City Council meetings. *Id.* ¶ 128.

The day after the shooting, MPD representatives visited Ms. Alston at her home. *Id.* ¶ 26. They told her that an "incident" had occurred, handed her contact information for the D.C. medical examiner, asked if she had questions, and "apathetically" extended their condolences. *Id.* Ms. Alston describes their demeanor as "curt" and "thoughtless." *Id.* ¶ 164.

Ms. Alston sought additional information, including the full BWC footage of the shooting. *Id.* ¶¶ 38–39. MPD refused to provide that footage for more than two years. *Id.* ¶ 38. On Ms. Alston's first attempt, MPD told her that she was not entitled to view the footage "because Mr. Alston was not a minor" and so "*only* Mr. Alston—who had been killed—had a right to view the footage." *Id.* ¶ 39. In August 2019, more than one year after Mr. Alston's death, MPD allowed Ms. Alston to see a shortened, "pre-edited and manipulated" version of the BWC footage. *Id.* ¶ 40. MPD had initially approved Ms. Alston's request to bring a small group of supportive family and community members with her to view the footage, but later "reneged on their agreement" and allowed Ms. Alston to bring only three people with her. *Id.* ¶ 41. By January 2020, after an unsuccessful FOIA request by Ms. Alston, MPD agreed to release the BWC footage "on a rolling basis." *Id.* ¶ 44. However, "MPD has yet to comply with th[at] decision and Ms. Alston is still awaiting release of the documents responsive to her request, including . . . a complete autopsy report, the internal investigation, and the names of all officers involved." *Id.* ¶¶ 43–44.

On July 31, 2020, MPD publicly released a "Community Briefing Video" providing MPD's account of the shooting. *Id.* ¶¶ 22, 50 n.4, 58–63. Ms. Alston had been offered the opportunity to view the footage three days before it was released to the public, but "was not informed that she had a right to view the footage in a non-law enforcement setting." *Id.* ¶ 48. The

day of the release, MPD left Ms. Alston a voicemail stating that the footage of her son's death

would be released that day; however, "members of the news media were informed that the footage

would be released . . . several hours prior to the voicemail MPD left for Ms. Alston." *Id.* ¶¶ 51–

52. Ms. Alston was never given an opportunity to give or decline consent to the video's release.

*Id.* ¶ 51. Two weeks later, the District of Columbia provided Ms. Alston's counsel with what it

describes as the unredacted versions of Officers Demeritt and Koch's BWC footage from the day

of the shooting. *Id.* ¶ 23.

Ms. Alston filed this lawsuit, ECF 1, and subsequently amended her complaint, ECF 9. In

two separate motions, the District of Columbia, ECF 32, and Officers Demeritt and Koch, ECF 31,

move to dismiss the amended complaint pursuant to Rule 12(b)(6). The motions are fully briefed,

and the Court is now prepared to rule.

## II.    LEGAL STANDARD

In considering a Rule 12(b)(6) motion for failure to state a claim, the Court must determine

whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. The Court "must accept as true all of

the allegations contained in a complaint," but need not do the same for legal conclusions or "naked

assertions" of wrongdoing devoid of supporting facts. *Id*; *Harris v. D.C. Water & Sewer Auth.*,

791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*,

556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Additionally, so

long as "the facts that give rise to the defense are clear from the face of the complaint," a Rule

12(b)(6) motion may raise affirmative defenses such as immunity or untimeliness. *See*

*Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

6

When ruling on a 12(b)(6) motion, the universe of reviewable facts is limited. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). However, "when the bare allegations of the complaint conflict with any exhibits or documents, whether attached or adopted by reference, the exhibits or documents prevail." *Davis v. World Savings Bank, FSB*, 806 F. Supp. 2d 159, 172 (D.D.C. 2011). This rule applies all the same to video exhibits. *See, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Hum. Servs.*, 656 F. Supp. 3d 137, 151 n.7 (D.D.C. 2023) (considering press conference footage uploaded to YouTube); *Garcia v. Does*, 779 F.3d 84, 88 (2d Cir. 2015) ("[W]e take as true the facts set forth in the Complaint, to the extent that they are not contradicted by the video evidence.").

## III.    ANALYSIS

Ms. Alston, the special administrator of her son's estate, seeks damages for constitutional and common-law violations under D.C.'s Wrongful Death Act, D.C. Code § 16-2701, and Survivorship Act, D.C. Code § 12-101. The Wrongful Death Act allows next of kin to recover monetary losses suffered *by them* as a result of the decedent's death (for example, financial support the deceased would have provided), while the Survivorship Act allows the decedent's estate to sue for, among other things, injuries *to the decedent* that caused the decedent's death. *See Greater Se. Cmty. Hosp. v. Williams*, 482 A.2d 394, 396–97 (D.C. 1984).

As a threshold matter, the Court notes that Ms. Alston brings many of her claims against all "Defendant Officers": Officer Koch, Officer Demeritt, and "Officers Z and A." *See* ECF 9 ¶ 8; *id.* at 25–27; 33, 35–38, 40–42. Only Officers Koch and Demeritt have been named and served, and they have moved to dismiss the claims against them. *See* ECF 16 (serving Officers Koch and

Demeritt). Ms. Alston named Officers Z and A as placeholders for unidentified officers with supervisory authority over Demeritt and Koch. ECF 9 ¶ 8 n.2. Because Officers Z and A have not been identified and served, and thus have not moved to dismiss the claims against them, this opinion deals only with the claims brought against the District and Officers Koch and Demeritt. When the Court refers to "Defendants" in this opinion, it is referring only to the District, Koch, and Demeritt.

Broadly, Ms. Alston brings three sets of claims: constitutional challenges on behalf of the estate, common law claims on behalf of the estate, and common law claims on her own behalf. The Court takes each category of claims in turn.

### A. Constitutional Claims (Counts 1–10)

Ms. Alston asserts Fourth Amendment claims for false arrest and excessive force (Counts 1–4) and Fifth and Fourteenth Amendment due process claims (Counts 5–6) against the officers who shot her son. ECF 9 ¶¶ 94–122. She also sues the District for the same constitutional violations, alleging that the District's unconstitutional policy—"jump-outs"—led to Mr. Alston's death (Counts 7–8). ECF 9 ¶¶ 123–38; *see Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Ms. Alston initially alleged unconstitutional deprivation of access to the courts against all Defendants (Counts 9–10), ECF 9 ¶¶ 139–43, but concedes these claims in her opposition, *see* ECF 25 at 46; ECF 22 at 34–35. Counts 9 and 10 are therefore dismissed.

Defendants move to dismiss Ms. Alston's constitutional claims on a variety of grounds, including qualified immunity. However—at this early stage of the litigation—the Court cannot agree that the officers are entitled to immunity on Ms. Alston's Fourth Amendment claims and will allow those claims to go forward. The Court also finds that Ms. Alston has alleged sufficient

8

facts to allow her Fourth Amendment claims against the District to proceed to discovery. The Court, however, will dismiss her Fifth (and Fourteenth) Amendment claims.

### 1. Fourth Amendment Claims Against Defendant Officers (Counts 1–4)

Ms. Alston alleges that MPD officers violated Mr. Alston's Fourth Amendment rights when they chased, shot, and killed him. She brings two types of Fourth Amendment claims—false arrest (Counts 1 and 2) and excessive force (Counts 3 and 4)—both of which flow from the constitutional right of the people to be protected against unreasonable seizures. *See* U.S. Const. amend. IV.

The seizure of a person occurs either "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). An arrest is a type of seizure that, under the Fourth Amendment, becomes constitutionally unreasonable when there is no probable cause to believe that a crime has been or is being committed (i.e., false arrest) or when the force used to seize a person is more severe than reasonably necessary (i.e., excessive force). *See Graham v. Connor*, 490 U.S. 386, 396 (1989). In both cases—whether the analysis centers on probable cause or the reasonable degree of force—the central inquiry is whether the officer's conduct was objectively reasonable. *See Graham*, 490 U.S. at 388; *Maryland v. Macon*, 472 U.S. 463, 470–71 (1985). It does not matter what "the officer's actual state of mind [was] at the time the challenged action was taken." *Macon*, 472 U.S. at 470–71.

Defendants Demeritt and Koch argue that they are entitled to qualified immunity. ECF 31 at 13–20. Qualified immunity is an affirmative defense that shields officers from liability for claims of unlawful conduct, so long as that conduct does not violate clearly established statutory or constitutional law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, the Court must decide

(1) whether Ms. Alston has alleged a violation of a constitutional right, and (2) whether that right was clearly established at the time of the violation. *Id.* at 232.[3] The inquiry turns on whether the officer's actions were "objectively reasonable," *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993), and the court must assess the facts "in the light most favorable to the party asserting the injury," *Corrigan v. District of Columbia*, 841 F.3d 1022, 1035 (D.C. Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The Court turns first to Ms. Alston's excessive force claims (Counts 3–4), and then to her false arrest claims (Counts 1–2).

### a. Excessive Force

Officers Koch and Demeritt exerted lethal force: they shot and killed Mr. Alston. It has long been clearly established that it is "constitutionally unreasonable to prevent escape by using deadly force" unless there is "probable cause to believe that the suspect poses a threat of serious physical harm to the officers or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see* ECF 31 at 16–17; ECF 25 at 23. Therefore, the officers are entitled to qualified immunity only if a reasonable officer could have believed that Mr. Alston posed a threat of serious physical harm.

The Court acknowledges that qualified immunity sets a high bar for Ms. Alston to clear. Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Courts assess whether an officer's use of force was objectively reasonable "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And that reasonableness analysis must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

---

[3] Under *Pearson*, a court need not always explicitly conduct both steps of the inquiry or do so in that order. *See* 555 U.S. 223 at 236.

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The Court is also cognizant of "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). The dispute the Court encounters today, however, is a dispute over facts rather than law. The parties disagree about the events leading up to Mr. Alston's death and the BWC footage does not conclusively resolve that debate. Factual disputes are not resolved on motions to dismiss. Because Ms. Alston's complaint plausibly alleges that Officers Koch and Demeritt could not have reasonably believed that Mr. Alston posed a threat of serious physical harm, and because the BWC footage does not unambiguously contradict that allegation, the Court cannot conclude today that the officers are entitled to qualified immunity.

### i.   The complaint plausibly alleges that qualified immunity does not attach

The Court begins with the complaint itself, which alleges the following: (1) Mr. Alston stood on the 3700 block of First Street Southeast, talking on his cell phone with an acquaintance and speaking with a group of individuals, ECF 9 ¶¶ 12, 34; (2) Officers Demeritt and Koch jumped out of their vehicles and chased Mr. Alston, who fled, *id.* ¶¶ 12, 15–16; (3) Defendant Officers had no reason to pursue Mr. Alston, *id.* ¶ 12, and the officers never identified themselves or gave Mr. Alston any commands, *id.* ¶ 15; (4) after running for a period of time, Mr. Alston "started to stop and turned to face Defendant Officers . . . then turned forward," *id.* ¶ 16; (5) after Mr. Alston turned forward, Defendant Officers shot him between twelve and eighteen times, *id.* ¶ 16; (6) Defendant Officers had no reason to shoot Mr. Alston, *id.* ¶ 105; (7) MPD's story about why officers shot Mr. Alston (including whether he was holding a gun) has changed over time and is not credible, *id* ¶¶ 24–36; (8) although a still image later obtained from the BWC footage appears to show Mr. Alston holding a "thin black object," the object is approximately the size of a cell

phone and "[a]t no time in the video is there a clear or even remotely discernible image of a gun," *id.* ¶ 58; and (9) witnesses at the scene reported that they never saw Mr. Alston with a gun or heard any crossfire, *id.* ¶ 31.

Assuming these allegations are true and drawing all reasonable inferences in Ms. Alston's favor, as the Court must, *see Corrigan*, 841 F.3d at 1035; *Iqbal*, 556 U.S. at 678, the Court finds that Officers Demeritt and Koch are not entitled to qualified immunity at this early stage of the case. Ms. Alston argues that officers had "no reason to believe that [Mr. Alston] was armed," ECF 25 at 25, and backs up that argument citing the well-pled facts from her amended complaint that the Court has set forth above. Accepting as true Ms. Alston's allegation that officers had no reason to believe, at any point, that Mr. Alston was armed, *see id.* ¶ 100, the Court draws the reasonable conclusion in her favor that a reasonable officer on the scene would not have believed that Mr. Alston presented a serious physical threat. And, at the risk of stating the obvious, it is clearly established that it is "constitutionally unreasonable" for officers to shoot and kill a fleeing man without any reason to believe he is armed or otherwise dangerous. *See Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

To be clear: the question here is not whether Mr. Alston was *in fact* holding a cell phone (or any other item). For purposes of the excessive force and qualified immunity inquiries, it matters only what a reasonable officer would have believed he was holding at the time of these events. And the complaint plausibly alleges that no reasonable officer on the scene could have believed that Mr. Alston was holding a gun based on the facts and circumstances as they would have appeared to the officers involved. At this early stage, the Court has no sworn testimony from

12

Defendant Officers to understand what they claim to have seen or perceived in the moment. As other courts have recognized, it is difficult for the Court to consider whether the officers' conduct was justified or whether they are entitled to qualified immunity without any testimony from them, documenting their version of these events.[4] *See, e.g.*, *Kyle v. Bedlion*, No. 12-cv-1572, 2014 WL 12539324, at *1 (D.D.C. Nov. 12, 2014) (concluding that the court "cannot fairly assess the events in question and [the defendant officer's] knowledge of them—as an evaluation of probable cause and a determination of the applicability of qualified immunity requires—without [the officer's] sworn testimony regarding the facts and circumstances preceding Plaintiff's arrest"). Absent such testimony, and looking to the complaint alone, the officers are not entitled to qualified immunity.[5]

### ii. The body-worn camera footage does not establish that the officers are entitled to qualified immunity

Officers Demeritt and Koch urge the Court to look beyond the four corners of the complaint and consider the body-worn camera (BWC) footage of the shooting. ECF 31 at 17–18; *see id.* at 39–42 (referencing the BWC footage, which the Court refers to as "Defs. Exs. A–D".) According to Defendants, the footage "shows M[r]. Alston turned towards [the] Officers . . . with a weapon in hand *before* they shot him" and the officers are therefore entitled to qualified immunity. *Id.* at 18. The Court agrees that it may consider the BWC footage because it is

---

[4] Of course, a court may not need such testimony if there is clear video evidence documenting what happened. But that is not the case here, as the Court finds below.

[5] Some sections of Ms. Alston's complaint recount MPD's own statements about the shooting—not for the truth of those statements, but to support her allegation that MPD's post hoc justifications are not credible. *See, e.g.*, ECF 9 ¶¶ 13, 27–29. It is worth noting that Defendants have complicated matters by quoting those sections of Ms. Alston's complaint as if they represent her own allegations of what happened on the scene. For example, Defendants point to language in the complaint that "at some point during the chase Mr. Alston reached towards his waistband and brandished a gun before Officers X and Y shot him," ECF 31 at 17 (citing ECF 9 ¶ 27), to suggest that is what happened. If Mr. Alston did allege that, the Court would agree with Defendants that the officers are immune from this suit. But Ms. Alston does *not* allege that Mr. Alston ever had a gun, much less brandished one. The passage Defendants cite is one in which Ms. Alston recounts MPD's own inconsistent statements about the shooting to illustrate that MPD's story has changed over time and thus is not credible. In fact, Ms. Alston goes on to allege that Defendants' shifting justifications for the shooting *conflict* with witness statements and other evidence. *See* ECF 9 ¶ 33 (alleging that "[m]ultiple witnesses on the scene at the time of the shooting dispute MPD's characterization, denying ever seeing Mr. Alston with a gun or hearing any crossfire").

incorporated into the complaint by reference but disagrees that the footage entitles the officers to qualified immunity.

At the motion-to-dismiss stage, a court may consider documents or materials that are "referred to in the complaint" and "integral" to a claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). Several Circuits have held that this rule extends to video exhibits. *See Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013); *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017); *Hartman v. Walker*, 685 F. App'x 366, 368 (5th Cir. 2017); *see also Johnson v. District of Columbia*, 725 F. Supp. 3d 62, 67–68 (D.D.C. 2024) (considering video evidence in deciding a motion for judgment on the pleadings). The complaint refers extensively to the BWC footage, and Ms. Alston does not contest that the footage is incorporated into the complaint by reference; rather, she disputes what facts and inferences the Court should draw from that footage. *See* ECF 25 at 11 ("The limited BWC footage does not provide a dispositive representation of the facts."). The Court therefore concludes that the BWC footage is incorporated into the complaint by reference and can be considered in resolving Defendants' motions to dismiss.

The more difficult question is what to make of the BWC footage. The Supreme Court held in *Scott v. Harris*, 550 U.S. 372 (2007) that, if a plaintiff's version of events is "utterly discredited" by video footage, the court may not "rel[y] on such visible fiction" and should instead "view[] the facts in the light depicted by the videotape." *Id.* at 380–81. In *Scott* (which dealt with a motion for summary judgment rather than a motion to dismiss), a police officer ended a high-speed chase by ramming the suspect's vehicle, severely injuring the driver. *Id.* at 374–75. The Eleventh Circuit agreed with the plaintiff that the officer was not entitled to qualified immunity because "there was little, if any, actual threat to pedestrians or other motorists" during the chase. *Id.* at 378. But the Supreme Court found that video of the chase "clearly contradict[ed]" that version of the story:

"[f]ar from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 378–80.

But video evidence is not always as clear as the Supreme Court found it was in *Scott*. Videos, like any other evidence, "may contain ambiguities that are subject to interpretation"— perhaps because "the video was shot from a bad angle" or "does not contain crucial audio." *Baker v. City of Madison*, 67 F.4th 1268, 1277 (11th Cir. 2023). When that is the case, "courts must construe all ambiguities in the video footage in favor of the plaintiff, as they must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor." *Id.* Thus, even at the summary judgment stage, courts have held that blurry, low-resolution, or otherwise ambiguous BWC footage may not accurately depict what an officer saw, creating genuine disputes of material fact that must be decided by a jury. *See, e.g.*, *Smith v. Finkley*, 10 F.4th 725, 740 (7th Cir. 2021) (finding that qualified immunity did not attach where "[t]he officers' videos do not blatantly contradict or corroborate the version of events for one side or the other, leaving [a] factual dispute unresolved," and the moments in question were "an essential part of the totality of the circumstances in evaluating whether the seizure by shooting was a constitutional violation"); *Argueta v. Jaradi*, 86 F.4th 1084, 1090 (5th Cir. 2023) (observing that "a jury would be left to determine what happened in the moments the footage is dark, blurry, or physically obscured").

The BWC footage here is anything but clear. The quality is poor and the officers' body-worn cameras bounce wildly as they chase Mr. Alston. *See* Defs. Ex. A (BWC of Officer Koch); Defs. Ex. B (BWC of Officer Demeritt).[6] Officer Demeritt's footage captures no audio until immediately after the shooting, *see* Defs. Ex. B at 0:00–2:00, and Officer Koch's BWC

---

[6] The Court will follow Ms. Alston's lead and infer that Exhibit A is Officer Koch's BWC footage, and Exhibit B is Officer Demeritt's BWC footage. *See* ECF 25 at 11 n.6.

footage has no audio during the first several seconds of the video, when the officers are in their vehicles, *see* Defs. Ex. A at 0:00–0:07. At one crucial moment—the moment when the first gunshot is heard on Officer Koch's BWC footage—his body-worn camera is pointing at the ground. Defs. Ex. A at 0:14. And even when viewed slowed-down and frame by frame, the footage is too blurry for the Court to identify the black object in Mr. Alston's hand as a weapon. *See* Defs. Ex. C at 0:42–0:45. The Court therefore cannot agree with Defendants that the video footage definitively "shows M[r]. Alston turned towards [the officers] with a weapon in hand before they shot him." ECF 31 at 18. Nor can the Court discern Mr. Alston "reach[ing] towards his waistband" as if for a gun, as Defendants allege. ECF 31 at 17; *see* Defs. Ex. C at 0:42–0:45.

In other words, the BWC footage is ambiguous as to nearly every material issue—and the Court "must construe all ambiguities in the video footage in favor of the plaintiff," just as it would with a written pleading. *Baker*, 67 F.4th at 1277. The Court cannot discern what a reasonable officer would have seen in Mr. Alston's hand, because the video is simply too frantic and blurry to make that conclusion. The still image from the BWC footage that Defendants rely on is no better. *See* ECF 31 at 18. For one, a still image freezes a split-second in time, allowing its viewer to scrutinize that moment in a way that an officer on the scene could not. For that reason, the still image arguably does not reflect how an officer on the scene would have observed these events. And regardless, the still image is also too blurry and low-resolution for the Court to see what, exactly, Mr. Alston is holding. *See* ECF 31 at 18.

Defendants ask this Court to infer that the "thin black object" in Mr. Alston's hand was a gun, or that a reasonable officer would have believed it to be a gun—but that would require the Court to construe ambiguities in Defendants' favor rather than Ms. Alston's. If the officers testified that they believed Mr. Alston had a gun, a fact finder could well find that belief reasonable and

16

that testimony credible based on its own conclusion that the object in the video looks like a gun. Or perhaps, considering all the evidence Ms. Alston may present, a jury could conclude that it would not have been reasonable for officers to believe that Mr. Alston was armed or posed a threat to them. At this early stage, the Court cannot discern from the video footage alone whether the officers may have had some other reason to believe that Mr. Alston was armed or otherwise posed a serious threat—or why the officers pursued Mr. Alston at all—because none of the BWC footage captures audio while the officers are in their vehicles, before the pursuit begins.

To be clear, the Court can see from the still image that Mr. Alston appears to have *some object* in his hand. See ECF 31 at 18. If Ms. Alston suggested otherwise, the Court would not be bound to accept that characterization. But the Court cannot find, as a matter of law, that the mere fact that Mr. Alston was holding some object automatically entitles the officers to qualified immunity. To the contrary, courts have held that officers who used lethal force because they claimed to believe an unidentified object was a weapon are not necessarily entitled to qualified immunity and may violate the clearly established law set out by the Supreme Court in *Garner*, 471 U.S. 1. *See Graves v. Malone*, 810 F. App'x 414, 442 (6th Cir. 2020) (holding that officers were not entitled to qualified immunity, despite officers' argument that a "lethal threat arose when Graves raised his hand with a black plastic object in it [and an officer] testified that he believed the object . . . was a gun," because "the object in Graves's hand was not a gun, bore little likeness to a gun, and [the officer] himself testified that he had no reason to believe the object was a gun"); *Dorato v. Smith*, 108 F. Supp. 3d 1064, 1150 (D.N.M. 2015) (finding that qualified immunity did not attach where plaintiff's actions "indicate[d] that his manifest intent was to flee, not to harm [the officer]" and "a reasonable juror could conclude that [the officer] knew that [plaintiff] was holding a cellular telephone or at least knew that [plaintiff] was not holding a gun").

17

The BWC footage undoubtedly depicts a chaotic scene in which Officers Koch and Demeritt were required to make "split-second judgments" under "tense, uncertain, and rapidly evolving" circumstances. *Graham*, 490 U.S. at 396–97. But those judgments would nonetheless be unreasonable if the officers had no reason to believe that Mr. Alston was armed or posed a serious threat. That is exactly what Ms. Alston's complaint has alleged, and the BWC footage does not render those allegations a "visible fiction." *Scott*, 550 U.S. at 380–81.

To sum up: considering the complaint and the BWC footage together, Ms. Alston has plausibly alleged that a reasonable officer on the scene would not have believed that Mr. Alston was armed or otherwise posed a serious threat and the BWC footage does not clearly contradict that story. Taking her allegations to be true, Ms. Alston has pled that Officers Koch and Demeritt violated Mr. Alston's clearly established constitutional right to be free from excessive force under the Fourth Amendment. See *Pearson*, 555 U.S. at 232–33; *Garner*, 471 U.S. at 11. The officers are not, at this stage, entitled to qualified immunity as to Counts 3 and 4.

### b. False Arrest

Counts 1 and 2 allege that Defendant Officers falsely arrested or unreasonably seized Mr. Alston by shooting him. *See* ECF 9 ¶¶ 95–100. "[T]here can be no question that apprehension by the use of deadly force is a seizure." *Garner*, 471 U.S. at 7. So, in deadly force cases like this one, a plaintiff may allege both that officers lacked probable cause to seize him (a false arrest or unlawful seizure claim) and that officers lacked probable cause to use deadly force (an excessive force claim).

The false arrest analysis largely overlaps with the excessive force analysis above. Officers seized Mr. Alston within the meaning of the Fourth Amendment by shooting him. *See id.* It is clearly established that, "to comport with the Fourth Amendment, a warrantless search or seizure

18

must be predicated on particularized probable cause." *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006). Ms. Alston argues that the Defendant Officers "had no probable cause or reasonable suspicion to believe Mr. Alston had engaged in or was about to engage in any illegal activity" when they shot him. ECF 9 ¶ 100. The complaint alleges that, before these events, Mr. Alston was merely standing on the 3700 block of First Street Southeast, talking on his cell phone and speaking with a group of friends. *See id.* ¶¶ 12, 34. And for the reasons discussed above, the officers cannot rely on the fact that Mr. Alston was holding a "thin black object" as probable cause for this deadly seizure.[7] As the Court has explained, Ms. Alston plausibly alleges that no reasonable officer on the scene could have believed that Mr. Alston was armed, and the BWC footage does not render those allegations a "visible fiction." *Scott*, 550 U.S. at 380–81.[8]

Ms. Alston has plausibly alleged that Officers Koch and Demeritt lacked probable cause to seize her son, and therefore that they violated his clearly established Fourth Amendment right to be free from false arrest. The officers are not, at this stage, entitled to qualified immunity as to Counts 1 and 2.

*      *      *

The Court's analysis today does not resolve the qualified immunity issue for all time. Questions of qualified immunity are multifactorial and fact-specific, and any number of facts could emerge during discovery that would upend (or bolster) this Court's analysis. *See Flythe v. District of Columbia*, 791 F.3d 13, 18–19 (D.C. Cir. 2015) ("[D]eciding deadly force cases typically

---

[7] Indeed, neither the complaint nor the BWC footage establishes that the officers would have had probable cause to arrest Mr. Alston using any degree of force, deadly or otherwise. Accordingly, Defendants do not even argue that they would have had probable cause to arrest Mr. Alston for any crime other than one involving his purported possession or threatened use of a gun.

[8] Defendant Officers argue that Ms. Alston may not advance a distinct "lack of cause" (or "lack of probable cause") claim, because lack of probable cause is one element of false arrest. ECF 31 at 13. Because Ms. Alston clarifies in her opposition that she is not alleging a distinct "lack of cause" claim, ECF 25 at 22 n.7, the Court need not address this argument.

requires that we 'slosh our way through the factbound morass of reasonableness.'" (quoting *Scott*, 550 U.S. at 383)). In some cases, like *Scott*, video footage might render all those yet-undiscovered facts immaterial—say, a video that clearly shows a suspect running straight at an officer pointing a gun in his direction. *See, e.g.*, *Est. of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020) (explaining that it did not matter that a video "was taken from a significant distance and [was] grainy" because it was nonetheless clear that the suspect "pulled out a gun"). But that is simply not the case here. The Court is confronted with BWC footage that is blurry, chaotic, and missing key moments of both audio and visual. And the Court does not have the benefit of the usual record that could help it decipher ambiguous footage—in particular, sworn statements from the officers—because there has been no discovery or development of the factual record. *See Kyle*, 2014 WL 12539324, at *1. Given these limitations, the Court must allow Ms. Alston's Fourth Amendment claims to proceed to discovery.

### 2. Due Process (Counts 5–6)

Ms. Alston alleges that Mr. Alston was deprived of his Fifth Amendment right to due process when officers pursued, shot, and killed him without lawful basis.[9] ECF 9 ¶¶ 107–22. The Fifth Amendment's guarantee of due process is "intended to prevent government officials from abusing their power or employing it as an instrument of oppression." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). Only conduct that "shocks the conscience" gives rise to a substantive due process claim. *Id.* at 846; *see Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (recognizing that only conduct that "can properly be characterized as arbitrary, or conscience

---

[9] Ms. Alston also brings this claim under the Fourteenth Amendment, but the Fourteenth Amendment applies to states—not to the District or its employees. *See Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954) (holding that the Fourteenth Amendment does not apply to the District of Columbia); *Poindexter v. D.C. Dep't of Corr.*, 891 F. Supp. 2d 117, 125 (D.D.C. 2012) ("The Fourteenth Amendment . . . is not applicable to the actions of the District or its officials or employees."). The Court will therefore dismiss her Fourteenth Amendment claims.

shocking, in a constitutional sense" can support a due process claim). But, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular source of government behavior"—for example, the Fourth or Eighth Amendments—"that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Lewis*, 523 U.S. at 842.

Defendants argue that because Ms. Alston's excessive force and unlawful seizure claims are governed by the Fourth Amendment, she cannot sustain a distinct due process claim based on the same allegations. The Court agrees. Although Ms. Alston contends in her opposition that "the jump-out and the chase, separate and distinct from the shooting and death of [Mr. Alston], constitute violations of his due process rights under the Fifth Amendment," ECF 25 at 27–28, that theory does not follow from the allegations in her complaint. S*ee Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) ("[It] is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."). Ms. Alston's complaint does not allege any distinct (or alternative) allegations that form the basis of her due process claims.[10] Instead, she alleges that Officers Koch and Demeritt violated her son's due process rights because they "targeted," chased, and ultimately "intentionally" shot and killed him "without any provocation or lawful reason" and without making any "reasonable inquiry as to whether Mr. Alston was engaged in or was about to engage in any illegal activity." ECF 9 ¶¶ 110–12. Such claims are covered by the Fourth Amendment (as the Court has discussed at length above) and therefore merge. *See Graham*, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force—

---

[10] In the cases Ms. Alston relies on, courts permitted Fourth and Fifth Amendment claims to proceed simultaneously where plaintiffs pled distinct, alternative theories in support of their causes of action. *See, e.g.,* ECF 25 at 30. Reviewing this complaint, the Court discerns one theory—that Defendant Officers pursued and shot Mr. Alston without lawful justification. That theory is covered by the Fourth Amendment. And even if Ms. Alston had plausibly alleged a distinct Fifth Amendment theory, she would have to explain why Defendant Officers' conduct in chasing Mr. Alston—separate and apart from shooting him—violated clearly established law such that the officers would not be entitled to qualified immunity.

deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). Indeed, Ms. Alston identifies the officers' alleged violation of Mr. Alston's Fourth Amendment rights as a basis for her due process claim. *See, e.g.*, ECF 9 ¶ 115 (alleging as basis for due process claim that officers "violated Mr. Alston's clearly established Fourth Amendment rights by using deadly force in shooting at him twelve to eighteen times on June 12, 2018"). At the end of the day, this case is about the fatal shooting of Mr. Alston, which Ms. Alston can challenge (and is challenging) under the Fourth Amendment.

Because Ms. Alston's constitutional claims are covered by the Fourth Amendment, her Fourth and Fifth Amendment claims merge. However, if further factual development reveals that any part of Ms. Alston's claim is not covered by the Fourth Amendment, she is free to move to amend her complaint to raise a Fifth Amendment claim. The Court therefore grants Defendants' motion to dismiss Counts 5 and 6 without prejudice to Ms. Alston raising these claims at a later stage if warranted.

### 3.    Constitutional Claims Against the District (Counts 7–8)

A municipality is liable for its employees' constitutional violations under 42 U.S.C. § 1983 if (1) those employees were following municipal policy or custom, and (2) that policy or custom caused the constitutional violation. *See Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *Monell*, 436 U.S. at 694. Because Ms. Alston has sufficiently alleged that the District had a policy or custom of using jump-outs, and that that policy or custom led to her son's death, her *Monell* claim against the District may proceed on that basis.

### a.  Ms. Alston alleges a policy or custom of using jump-outs

A plaintiff can allege a policy or custom by showing (1) a municipality "explicitly adopted" a policy, *see Warren*, 353 F.3d at 39; (2) a policymaker took an official action that can be imputed to the municipality, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–30 (1988); (3) a policymaker "knowingly ignore[d] a practice that was consistent enough to constitute custom," *see Warren*, 353 F.3d at 39; or (4) the municipality failed to properly train its employees in such a way that constituted "deliberate indifference" to constitutional rights, *see City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "[O]ur Circuit has held that a plaintiff need not identify multiple instances of unconstitutional conduct in order to prove an unconstitutional municipal policy . . . [but] she still 'must include some factual basis for the allegation of a municipal policy or custom.'" *Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 123 (D.D.C. 2012) (quoting *Atchinson v. District of Columbia*, 73 F.3d 418, 422 (D.C. Cir. 1996)). For example, the D.C. Circuit has held an allegation that prison officials "stuck the same needles in everybody's arms" to be sufficient factual basis for a *Monell* claim. *Warren*, 353 F.3d at 40. By contrast, a bare allegation that a municipality has a "'custom, policy or practice of condoning' the violation of constitutional rights," absent any alleged facts reflecting such a policy, cannot support a *Monell* claim—it is merely "a conclusory recital of the elements of a claim." *Sheikh v. District of Columbia*, 77 F. Supp. 3d 73, 85 (D.D.C. 2015).

Ms. Alston identifies a number of alleged municipal policies in her amended complaint, claiming that MPD "oversaturate[s] the police presence in certain predominantly Black neighborhoods," ECF 9 ¶ 126, "fail[s] to adequately train, supervise, and oversee its officers," *id.* ¶ 133, and "employ[s] a police code of silence, where officers and supervisors cover up instances of unjustified deadly force," *id.* ¶ 134. But her opposition seems to focus on one alleged policy for

which the District could be liable in this suit: that it is MPD's policy or custom to "conduct illegal jump-outs in predominantly Black neighborhoods in order to target, ambush, and intimidate young, Black men," that these jump-outs frequently result in, and are perhaps used to perpetuate, Fourth Amendment violations (like using excessive force), and that policymakers either adopted or "knowingly ignored" that practice. ECF 22 at 28–29 (arguing that, "[i]n addition to the specific allegation that [Mr. Alston] was the target of an illegal jump-out, the Amended Complaint references multiple credible allegations of similar behavior by MPD in other instances," and that such allegations "support[] a plausible claim of a custom, pattern, or practice" (citing ECF 9 ¶¶ 126, 128, 131)); *see Warren*, 353 F.3d at 39. The Court will dismiss Ms. Alston's *Monell* claim to the extent that it was based on other alleged policies beyond MPD's use of jump-outs, because she has failed to defend those policies against the District's motion to dismiss.

Ms. Alston plausibly alleges that MPD has a policy of conducting unlawful jump-outs. According to Ms. Alston, jump-outs are "DC's scarier version of stop-and-frisk": multiple officers "suddenly emerge from a car and descend upon a single suspect or group on the street, often with the goal of surprising them in order to search and potentially detain them if something illegal can be recovered." ECF 9 ¶ 66. The complaint cites a number of sources that document specific incidents of jump-outs—particularly in D.C.'s Ward 8 where Mr. Alston was shot—and indicate this tactic was so pervasive that it was raised as a concern by local government officials and advocacy organizations. *See id.* ¶ 128 (citing (a) news articles about jump-outs, (b) 2014 City Council hearings on jump-outs, (c) a 2015 listening session in D.C. held by President Obama's Task Force on 21st-Century Policing where citizens addressed jump-outs, and (d) 2015 testimony on the issue by the ACLU). To take just one example: the complaint cites a 2016 Newsweek article, which reported that 18-year-old Cedric Harper had been subject to more than 10 jump-outs in the

District by armed MPD officers with guns drawn, and that 17-year-old Ishmael Reid experienced

so many jump-outs—including one involving five armed officers in southeast D.C.—that they

became "a normal thing." *See id.* ¶ 128 n.16 (citing Max Kutner, *'Jump-Outs': DC's Scarier

Version of 'Stop-and-Frisk,'* NEWSWEEK (last updated Mar. 13, 2016), https://perma.cc/XY56-

L8R7); *see also Jackson v. District of Columbia*, No. 23-cv-922, 2023 WL 7182120, at *1–2

(D.D.C. Nov. 1, 2023) (alleging that plaintiff was subject to an MPD jump-out); *Crudup v. District

of Columbia*, No. 20-cv-1135, 2023 WL 2682113, at *1–3 (D.D.C. Mar. 29, 2023) (same). Thus,

Ms. Alston has alleged "some factual basis for the allegation of a municipal policy or custom"

sufficient to survive a motion to dismiss. *Atchinson*, 73 F.3d at 422.

### b. The District's policy or custom of using jump-outs led to the constitutional violation

To make out a *Monell* claim, Ms. Alston must also allege that "a policy or custom of the

District of Columbia caused the constitutional violation alleged." *Baker v. District of Columbia*,

326 F.3d 1302, 1306 (D.C. Cir. 2003). "The court must determine whether the plaintiff has alleged

an 'affirmative link,' . . . such that a municipal policy was the 'moving force' behind the

constitutional violation." *Id.* (first quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823

(1985), then quoting *City of Canton*, 489 U.S. at 389). The District makes no robust argument here.

*See* ECF 32 at 17–19; ECF 27 at 14–15. It recites the applicable legal standard and states that

Ms. Alston has not alleged that "that any of these alleged customs, practices, or policies caused

[officers] X and Y to shoot [Mr.] Alston," ECF 32 at 19, (which is not an accurate reading of

Ms. Alston's allegations, as the Court will address below). Rather, the District focuses on the

argument that Ms. Alston has failed to plausibly allege that the District had a policy of jump-outs

at all—an argument the Court has already rejected. *See* ECF 32 at 16–17; ECF 27 at 14–15.

Absent any real argument from the District to the contrary, the Court finds that Ms. Alston has adequately pled that MPD's alleged policy of jump-outs was the "moving force" behind her son's death. *City of Canton*, 489 U.S. at 389. First, she alleges that Mr. Alston was subject to and killed during a jump-out: "at least two vehicles and six officers" ambushed Mr. Alston in predominantly Black Ward 8 "without warning, basis, or good cause," chased him, and shot him dead. ECF 9 ¶¶ 12, 15–16, 127–28. Thus, according to Ms. Alston, the officers, "created the circumstances of the shooting and intentionally put Mr. Alston in a position that resulted in his death . . . when at least six officers ambushed him and gave chase." *Id.* ¶ 110. Second, Ms. Alston alleges that jump-outs, as employed by MPD, regularly involve weapons and result in constitutional violations, like the excessive force that she alleges occurred here. *See id.* ¶¶ 66, 130; Kutner, *supra* Part III.A.3.a (describing one alleged jump-out in which "four police officers in bulletproof vests jumped out, guns drawn," and officers were carrying "big, tactical weapons," and another alleged jump-out in which at least one officer "had his handgun drawn"). After all, the entire point of jump-outs, according to Ms. Alston, is for officers to commit unlawful seizures and use excessive force as an intimidation tactic. *See* ECF 9 ¶¶ 126, 131–33.

Because MPD officers allegedly shot and killed Mr. Alston pursuant to MPD's policy of conducting jump-outs, Ms. Alston has plausibly alleged that MPD's policy or custom of conducting jump-outs caused her son's death. Of course, summary judgment will require Ms. Alston to back up these allegations with evidence—but at this early stage of the case, she has done enough to survive Defendants' motion to dismiss and proceed to discovery.

### B. Common Law Claims

Ms. Alston brings a number of common law claims on behalf of her son's estate. The Court first addresses her intentional tort claims, then turns to her negligence claims.

### 1.    Intentional Tort Claims (Counts 11–16)

Ms. Alston brings the following intentional tort claims against the officers and the District: battery, under the Wrongful Death Act (Count 11) and Survivorship Act (Count 12); assault, under the Wrongful Death Act (Count 13) and Survivorship Act (Count 14); and intentional infliction of emotional distress, under the Survivorship Act (Count 15). ECF 9 ¶¶ 144–61. The Court concludes that qualified privilege does not bar these claims, but that Ms. Alston's Survivorship Act claims are untimely and must be dismissed. Ms. Alston's intentional tort claims brought under the Wrongful Death Act (Counts 11 and 13) may proceed.

#### a.    Defendant Officers are not protected by qualified privilege

Defendants argue that Ms. Alston's intentional tort claims are barred because the officers are entitled to qualified privilege. ECF 31 at 16; ECF 32 at 24–26. In the District of Columbia, officers are deemed to hold a qualified privilege to use lethal force when they "actually and reasonably believe[], at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (emphasis omitted). Defendants' arguments for qualified privilege are identical to their arguments for qualified immunity. *See* ECF 31 at 15–20 (analyzing the two defenses together). Thus, for the same reasons that the officers are not entitled to qualified immunity at this early stage of the litigation, the Court also concludes that the officers are not entitled to qualified privilege. *See supra* Part III.A.1.

#### b.    Ms. Alston's Survivorship Act assault and battery claims (Counts 12 and 14) are time-barred

For Survivorship Act claims, the appropriate statute of limitations is that of the underlying claim itself. *Arrington v. District of Columbia*, 673 A.2d 674, 677 (D.C. 1996). The statute of limitations for assault and battery is one year. D.C. Code § 12-301(4). Officers shot and killed

Mr. Alston in June 2018, but Ms. Alston did not file this lawsuit until June 2020. *See* ECF 1. Ms. Alston therefore concedes that the statute of limitations on her Survivorship Act assault and battery claims has run. ECF 25 at 36.

However, Ms. Alston argues that the District is equitably estopped from raising the statute of limitations as a defense.[11] ECF 22 at 16–17. The doctrine of equitable estoppel "prevents a defendant from asserting untimeliness where the defendant has taken active steps to prevent the plaintiff from litigating in time." *Currier v. Radio Free Eur./Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1998) (emphasis omitted). "To prevail on a claim of equitable estoppel, a party must show that there was a 'false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance, as well as a showing of an injustice and lack of undue damage to the public interest.'" *Louisiana Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 9 (D.C. Cir. 2021) (quoting *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988)).

Ms. Alston alleges that the District took affirmative action to prevent her from suing on Mr. Alston's behalf by giving her incomplete or inaccurate information about the circumstances of her son's death and withholding crucial information about her son's killing—in particular, the unredacted BWC footage of the incident—until July 2020. *See* ECF 22 at 17–19; ECF 9 ¶ 22. For example, the District changed its public account of Mr. Alston's death "at least four times"; did not allow Ms. Alston to view any BWC footage until August 2019 (two months after the one-year statute of limitations had expired), and even then, only showed her a "pre-edited and manipulated version" of the footage; and failed to comply with a FOIA request for BWC footage and

---

[11] Ms. Alston raises equitable estoppel only as to the District, not as to the Defendant Officers. *Compare* ECF 22 at 16–18, *with* ECF 25 at 36. And she invokes equitable estoppel only as to Counts 12 and 14 (assault and battery), not as to Count 15 (IIED), which the Court takes up below. *See* ECF 22 at 16–19.

documentation related to Mr. Alston's killing. ECF 22 at 17–18. The Court assumes without deciding that such actions qualify as false representations calculated to prevent Ms. Alston from filing suit, *see Rosado v. Gonzalez*, 832 F.3d 714, 716–17 n.2 (7th Cir. 2016), but nevertheless finds that Ms. Alston has not adequately established her reliance on those representations. Ms. Alston filed this action in June 2020, *before* MPD released the unredacted BWC footage. *See* ECF 1; ECF 9 ¶ 22. She does not explain why, if she was able to file suit in June 2020 despite the District's false representations and ongoing withholding of information, she could not have filed suit before the statute of limitations expired. *Cf. Nelson v. Blinken*, No. 18-cv-1880, 2024 WL 3985365, at *8 (D.D.C. Aug. 29, 2024) (finding equitable estoppel applied where plaintiff "relied on the Department's representation that it would inform him of what he needed to do to raise a national origin discrimination claim with the EEOC"). There could well be a compelling explanation—a reason why Defendants' dissembling caused Ms. Alston to miss the deadline imposed by the statute of limitations but did not prevent her from filing in June 2020—but Ms. Alston has not offered one. "[T]he bar to adequately plead equitable estoppel is high," and Ms. Alston has not cleared it. *Id.* at *7; *see ATC Petroleum, Inc.*, 860 F.2d at 1111 ("[Estoppel's] application to the government must be rigid and sparing.").

Finally, even if Ms. Alston had adequately pled her reliance on MPD's false representations, she says nothing about one of the required elements of an equitable estoppel claim: "lack of undue damage to the public interest." *ATC Petroleum, Inc.*, 860 F.2d at 1111. The D.C. Circuit has cautioned that "[t]he case for [equitable] estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine." *Id.* Because Ms. Alston has made no argument on one of those elements, she has not properly alleged equitable estoppel.

29

Given that the statute of limitations has run and equitable estoppel does not apply, Counts 12 and 14 must be dismissed.

### c.  Ms. Alston's Survivorship Act IIED claim (Count 15) is time-barred

No statute specifically limits the time for filing an IIED claim, so a suit alleging only IIED is subject to the District's three-year residual statute of limitations. *Rendall-Speranza v. Nassim*, 107 F.3d 913, 920 (D.C. Cir. 1997); *see* D.C. Code § 12-301(8). But an IIED claim that is "'intertwined with any of the causes of action for which a period of limitation is specifically provided,' including assault and battery, is subject to the limitation period for the intertwined claim." *Rendall-Speranza*, 107 F.3d at 920 (quoting *Saunders v. Nemati*, 580 A.2d 660, 664–65 (D.C. 1990)). Ms. Alston alleges that Defendants inflicted emotional distress upon her son by chasing and shooting him, placing him "in imminent fear for his life." ECF 9 ¶¶ 155–57. Her IIED claim is inextricably bound up in, and "indeed it depends utterly upon," the allegations of assault and battery, so the statute of limitations is one year. *Rendall-Speranza*, 107 F.3d at 920. Ms. Alston contends that her IIED claim is also intertwined with her Section 1983 claims. *See* ECF 25 at 36–38; ECF 22 at 19–20. Because Section 1983 does not have its own limitations period, claims brought under that statute are subject to the District's three-year residual limitations period. *See Owens v. Okure*, 488 U.S. 235, 249–50 (1989); D.C. Code § 12-301(8). But that is of no moment. The D.C. Court of Appeals has held that only those IIED claims "*not* intertwined with any of the causes of action for which a period of limitation is specifically provided in the other provisions of section 12-301" are governed by Section 12-301(8)'s three-year residual limitations period. *Saunders*, 580 A.2d at 665 (emphasis added). Ms. Alston's IIED claim does not fall into that category because it is intertwined with causes of action—assault and battery—for which Section 12-301 provides a specific statute of limitations. That Ms. Alston's IIED claim also

overlaps with her Section 1983 claim does not negate the fact that her IIED claim is intertwined

with her assault and battery claims.[12] *See Zhi Chen v. Monk*, 701 F. Supp. 2d 32, 36–38

(D.D.C. 2010) (IIED claim was "based on the same events as [plaintiff's] claims for assault [and]

battery" and therefore subject to one-year statute of limitations, even though plaintiff also brought

a Section 1983 claim for the same incident). The applicable statute of limitations for Ms. Alston's

Survivorship Act IIED claim is therefore one year, so Count 15 is dismissed as untimely.

### 2. Negligence Claims (Counts 17, 19–24)

Ms. Alston sues both Defendant Officers and the District for negligent infliction of

emotional distress (Count 17), negligent supervision, retention, and training (Counts 19–22), and

negligent use of excessive force and failure to render aid (Counts 23 and 24). ECF 9 ¶¶ 173–81,

188–216. She brings each of these claims under both the Wrongful Death and Survivorship Acts,

with the exception of negligent infliction of emotional distress, which she brings only under the

Survivorship Act. *See id.* The Court finds that Ms. Alston has adequately plead that officers acted

negligently at the scene and therefore may proceed on Counts 17, 23, and 24. She has also plausibly

alleged negligent supervision, retention, and training claims against the District, although not

against Officers Koch and Demeritt. Counts 19–22 may therefore proceed as to the District.

---

[12] Ms. Alston cites *Ronkin v. Vihn*, 71 F. Supp. 3d 124 (D.D.C. 2014), for the proposition that an IIED claim intertwined with a Section 1983 claim is subject to the residual three-year limitations period. *See* ECF 22 at 19–20; ECF 25 at 36–38. But *Ronkin* is inapposite. There, the sole vehicle for plaintiff's claims (including her common law claims) was Section 1983, and the court's task was to determine the limitations period for those Section 1983 claims. 71 F. Supp. 3d at 127, 138–40. That question is answered by the Supreme Court's decision in *Owens*, 488 U.S. 235: "where state law provides multiple statutes of limitations for personal injury actions, courts considering *§ 1983 claims* should borrow the general or residual statute for personal injury actions." *Id.* at 249–50 (emphasis added). But here, the vehicle for Ms. Alston's IIED claim is the Survivorship Act, not Section 1983. *See* ECF 9 ¶¶ 154–61. The statute of limitations question, therefore, is answered by District common law and the D.C. Court of Appeals' decision in *Saunders*, 580 A.2d 660. *See Ronkin*, 71 F. Supp. 3d at 139 n.15 (distinguishing cases where IIED claims were intertwined with other common law claims).

### a. Ms. Alston plausibly alleges that Defendants acted negligently at the scene (Counts 17, 23–24)

Ms. Alston claims that officers acted negligently by using excessive force and failing to provide first-aid services to Mr. Alston after shooting him (Counts 23 and 24), and that they negligently inflicted emotional distress upon Mr. Alston by doing so (Count 17). ECF 9 ¶¶ 173–81, 205–16. Defendants argue that the officers' alleged conduct in pursuing and shooting Mr. Alston was intentional, not negligent, and that one cannot recover for an intentional tort by "dressing [it] up" in the language of negligence. ECF 31 at 31; ECF 32 at 26. The Court finds that Ms. Alston has plausibly alleged distinct negligence claims, and may therefore proceed on Counts 17, 23, and 24.

As the D.C. Court of Appeals explained in *District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003), "[a]n individual who has been injured by a District police officer may sue under one or more common law theories of legal liability such as assault and battery or negligence." *Id.* at 705. However, to pursue both intentional tort and negligence claims, the claims "must be separate and distinct from each other, even though related, and each of the [claims] must be supported by the necessary evidence." *Id.* at 707. Courts in this District, relying on *Chinn*, dismiss negligence claims at the motion-to-dismiss stage where "the plaintiffs' complaints d[o] not support a negligence theory separate and apart from their intentional assault-and-battery claims." *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 46 (D.D.C. 2015) (collecting cases).

A negligence claim is sufficiently separate from an intentional tort claim if it is "[1] distinctly pled[,] [2] based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself[,] and [3] violative of a distinct standard of care." *Blair v. District of Columbia*, 190 A.3d 212, 224 (D.C. 2018) (quoting *Chinn*, 839 A.2d at 711). Ms. Alston meets the first requirement because she pleads her negligence claims as distinct

32

causes of action. *See* ECF 9 ¶¶ 173–81, 205–16. As to the second requirement: the D.C. Court of Appeals has held that a negligence claim is based on a distinct factual scenario where the incident gives rise to two "different stories." *Blair*, 190 A.3d at 223. For example, if a plaintiff claims that the officer shot a victim who was "standing still, hands empty," but the officer testifies "that he had believed the victim had a gun and 'turn[ed] around to face' the officer," those are two distinct factual scenarios. *Id.* (quoting *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982)). A plaintiff in such a case has alleged an intentional tort—that an officer shot a victim, knowing him to be unarmed—while the officer has alleged that he "shot in self-defense—at worst negligently." *Id.*; *see Chinn* at 707–11 (summarizing cases). The same is true here. Drawing all reasonable inferences in Ms. Alston's favor, she has alleged two plausible scenarios: (1) officers knew Mr. Alston was unarmed and shot him anyway (assault and battery), or (2) officers mistakenly believed that Mr. Alston was armed and shot him, perhaps negligently, in self-defense (negligent use of excessive force).[13] *See* ECF 9 ¶¶ 147, 214.

Finally, Ms. Alston meets the third *Chinn* requirement by alleging that officers violated "a distinct standard of care" established in a municipal regulation: 6-A DCMR § 207. ECF 9 ¶¶ 85–86; ECF 25 at 45. That regulation provides, in relevant part, (1) that MPD officers shall "use only the minimum amount of force which is consistent with the accomplishment of his or her mission, and shall exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms," and (2) that "no member of the Metropolitan Police Force shall discharge a firearm in the performance of police duties except . . . [t]o defend him or herself or another from

---

[13] Of course, if the officers mistakenly believed that Mr. Alston was armed and shot him in self-defense, they would be protected by qualified privilege so long as that mistake was reasonable. As previously discussed, Ms. Alston has plausibly alleged that no reasonable officer on the scene could have believed that Mr. Alston was armed—so, if the officers mistakenly believed Mr. Alston to be armed, that mistake was unreasonable. *See supra* Part III.A.1. Therefore, at this stage, the Court cannot find that Ms. Alston's negligence claims are barred by qualified privilege.

an attack which the officer has reasonable cause to believe could result in death or serious bodily injury." 6-A DCMR §§ 207.1, 207.2(a). Per the D.C. Court of Appeals, 6-A DCMR § 207 establishes a distinct standard of care sufficient to support a negligence claim, even in cases that also claim intentional excessive force.[14] *See White*, 442 A.2d at 162–63 & n.10; *District of Columbia v. Evans*, 644 A.2d 1008, 1020–21 (D.C. 1994). Defendants attempt to distinguish these cases, arguing that Mr. Alston did pose a threat and therefore officers complied with MPD regulations—but that is a factual dispute that the Court cannot resolve at the motion-to-dismiss stage. *See* ECF 28 at 25–26. The Court concludes that Ms. Alston has plausibly alleged distinct NIED and negligent use of force claims, separate and apart from her intentional tort claims.

Ms. Alston has also plausibly alleged that, after shooting Mr. Alston, officers negligently "failed to provide first-aid services and failed to promptly relay the urgent need for medical support to FEMS" (the D.C. Fire and Emergency Medical Services Department). ECF 9 ¶ 208. This is a negligence claim "separate and distinct" from any claim of intentional excessive force, because it takes issue with what officers did *after* they shot Mr. Alston. *Chinn*, 839 A.2d at 707; *see Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 151 (D.D.C. 2017) (concluding that negligent failure-to-treat claim was distinct from assault and battery claim). And Ms. Alston has pled the essential elements of a negligence claim: officers owed Mr. Alston a duty to "call[] emergency services immediately after a shooting occurs, as per MPD policy"; officers breached that duty by "fail[ing] to promptly relay the urgent need for medical support to FEMS"; and because of this breach, Mr. Alston did not receive any medical attention for over an hour, causing him to suffer and die. ECF 9 ¶¶ 208–09, 212–13, 215.

---

[14] Defendants argue that "[a] duty to use the minimum force necessary is not 'arguably distinct' from a duty to refrain from excessive force." ECF 31 at 32 (citing *Chinn*, 839 A.2d at 710-11). But the D.C. Court of Appeals has already held, as a matter of D.C. law, that the precise municipal regulation in question here does support a distinct negligence claim. *See White*, 442 A.2d at 162–63 & n.10; *Evans*, 644 A.2d at 1020–21. This Court is bound by those rulings.

Defendants' only counterargument here—again—boils down to nothing more than factual disputes, which this Court cannot resolve on a motion to dismiss. *See* ECF 28 at 26 (arguing that officers did call for medical treatment, and "cannot be held liable for the time it took [first responders] to arrive.").[15] In fact, the BWC footage, which Ms. Alston refers to in her complaint, corroborates many of her key allegations. *See* Defs. Ex. A at 0:27–3:45; Defs. Ex. B at 2:05–3:48. The footage, considered alongside Ms. Alston's allegations and in the light most favorable to her, paints a horrific scene: Mr. Alston falls to the ground and lies motionless on the concrete, blood pooling around his head. Onlookers scream. Officers step over and around Mr. Alston's splayed body, and do not appear to check whether he is alive. At this juncture, the Court only has the benefit of a one-sided presentation of allegations and the factual record may develop such that the Court must draw other inferences at later stages of the proceedings. But Ms. Alston has plausibly alleged distinct negligence claims in her amended complaint and may proceed on Counts 17, 23, and 24.

### b. Negligent Supervision, Retention, and Training (Counts 19–22)

Ms. Alston sues the District and Defendant Officers for negligently supervising, retaining, and training the officers who killed her son. ECF 9 ¶¶ 188–204. She brings these claims under both the Survivorship Act and Wrongful Death Act. *See id.* As a threshold matter, Officers Koch and

---

[15] Defendants raised two additional counterarguments in their motions to dismiss that they seem to abandon on reply and that the Court would nevertheless find inapposite. First, Defendants argue that Ms. Alston's NIED claim should be dismissed because she failed to plausibly allege "that a special relationship existed between M[r]. Alston and Officers Demeritt and Koch so as to create a duty owed to M[r]. Alston." ECF 31 at 33. But Ms. Alston clarifies in her opposition that she alleges NIED under a "zone of danger" theory, not under a special-relationship theory. *See* ECF 25 at 43–44; *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc) (describing "zone of physical danger" rule for NIED claims). Second, Defendants contend that Ms. Alston's negligent use of force claims fail because police officers do not owe a particular duty to individuals—a rule known as the "public duty doctrine." *See* ECF 31 at 34; *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C. 1990) (holding that police officers "owe no duty to provide public services to particular citizens as individuals. Instead, . . . the [ ] duty is to provide public services to the public at large."). But the D.C. Court of Appeals has held that the public duty doctrine "has no relevance" where "the harm to [a suspect] was caused directly by the officers at the scene." *Evans*, 644 A.2d at 1017 n.8. Both of these arguments, even if not abandoned, would therefore be unavailing.

Demeritt cannot be said to have negligently supervised, retained, and trained themselves, so these claims are dismissed as to Officers Koch and Demeritt.

Defendants argue that Ms. Alston failed to plead sufficient facts to state a claim and, regardless, that her claims are barred by sovereign immunity. ECF 32 at 29–32. Although Ms. Alston's complaint is not a model of clarity on this issue, the Court nonetheless finds that she has stated a claim that is not—at this stage—barred by sovereign immunity.

The parties agree that, to make out a negligent supervision, retention, or training claim, a plaintiff must show that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise [or train] the employee."[16] *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937–38 (D.C. 2002) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)); *see* ECF 32 at 29; ECF 22 at 32–33. Defendants correctly point out that Ms. Alston does not allege any specific prior instances of dangerous or incompetent behavior by Officers Koch and Demeritt that their supervisors knew or should have known about. *See* ECF 32 at 30–31; ECF 9 ¶¶ 192–94. But "a plaintiff need not demonstrate that the District had knowledge that particular officers engaged in misconduct if it was aware of a systemic issue within the police department." *Jackson*, 2023 WL 7182120, at *6. If a plaintiff alleges a systemic issue, she may instead show "that the alleged misconduct 'occurred with such regularity that the District was on notice of some common propensity among MPD officers.'" *Id.* (quoting *Spiller v. District of Columbia*, 302 F. Supp. 3d 240, 255 (D.D.C. 2018)). That is the argument the Court understands Ms. Alston to be making here—that the District was on notice of, and negligently ignored, a "common propensity," *Jackson*, 2023 WL 7182120, at *6, among its officers to conduct jump-outs

---

[16] "D.C. case law does not appear to distinguish between 'negligent supervision' and 'negligent retention.'" *Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 265 n.1 (D.D.C. 2016) (citing *Phelan*, 805 A.2d at 937).

that often involved the use of excessive force.[17] *See* ECF 22 at 33 (arguing that the District "has deliberately ignored" MPD officers' "well-documented use of jump-outs"); *see* ECF 9 ¶¶ 66, 126, 128–30, 201–02.[18] To quote another court in this District dealing with a virtually identical claim: Ms. Alston "has alleged that MPD was aware of a systemic issue with jump-outs within its ranks but buried its head in the sand. If this proves true, it will matter little whether MPD leadership was on notice that [Officers Koch and Demeritt] ever personally partook in this tactic." *Jackson*, 2023 WL 7182120, at *6.

Next, the District argues that Ms. Alston's claim is barred by sovereign immunity. ECF 32 at 31–32. The District is entitled to sovereign immunity for actions that are "discretionary," but not those that are "ministerial." *See Thurman v. District of Columbia*, 282 A.3d 564, 574 (D.C. 2022). Discretionary acts "require personal deliberation, decision, and judgment." *Id.* (quoting *Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995)). "Where there is room for policy judgment and decision, there is discretion." *Id.* (quoting *Nealon*, 669 A.2d at 690). Ministerial acts, on the other hand, "require little or no judgment, and generally constitute mere obedience to orders or performance of a duty in which the [municipal employee] has little or no choice." *Id.* (quoting *Nealon*, 669 A.2d at 690). Thus, the key issue for the Court is whether the complaint alleges (a) "flaws in the District's day-to-day oversight" of its officers—i.e. "the *execution* of rules and polices," which are ministerial, or (b) "deficiencies in the *development* of

---

[17] Ms. Alston also alleges that "MPD has failed to conclude its investigation and failed to discipline any officers for the killing of Mr. Alston." ECF 9 ¶ 195; *see also* ECF 22 at 33 (challenging MPD's "police code of silence," and alleging that MPD "changed its public account of Marqueese's killing multiple times" and "intentionally concealed and delayed the release of critical information following [his] death"). But those events cannot be said to have "proximately caused the harm in this case"—Mr. Alston's death—because they occurred *after* his death. *Phelan*, 805 A.2d at 939.

[18] Admittedly, many of the allegations that support Ms. Alston's systemic negligent supervision, retention, and training claims appear in the section of the complaint that addresses her *Monell* claims. But at this stage, the Court must look to the complaint as a whole and draw all reasonable inferences in Ms. Alston's favor. Because the factual matter that supports a systemic claim here does appear in the complaint, and because Ms. Alston appears to be arguing in her opposition that MPD had a systemic problem with jump-outs, the Court concludes that she has stated a claim.

municipal policy," which are discretionary. *Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 231 (D.D.C. 2018).

Training, supervising, and retaining police officers can include both discretionary and ministerial duties. *Carter v. Carlson*, 447 F.2d 358, 363–64 (D.C. Cir. 1971), *rev'd in part on other grounds*, 409 U.S. 418 (1973). But the D.C. Circuit has squarely held that "supervising and instructing officers" in the field, including supervising officers "conducting a felony stop, and conducting a felony pursuit" is a ministerial rather than discretionary act. *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1363 (D.C. Cir. 1984). Such actions involve "day-to-day operational matters, not planning and policy." *Id.* Drawing all reasonable inferences in Ms. Alston's favor, she has plausibly alleged that Defendants failed to properly supervise and instruct Officers Koch and Demeritt, and that those failures led to Mr. Alston's death. Ms. Alston alleges that Koch and Demeritt's supervisors "instructed, conspired with, or encouraged" them "to pursue and subsequently shoot Mr. Alston, whether specifically or as part of a broader instruction to conduct jump-outs," and that they "failed to adequately supervise and train" Koch and Demeritt "in proper uses of deadly force, despite previous known and widespread constitutional violations by subordinate officers." ECF 9 ¶¶ 117, 119. She further alleges that the District's "failure to enforce its own policy guidelines" led to a custom and practice of officers using jump-outs. *Id.* ¶ 133. These allegations that Defendants erred in the execution of (not the development of) rules and policies deal with ministerial functions and are therefore not barred by sovereign immunity.

Certain of Ms. Alston's more ambiguous allegations may toe the line between ministerial and discretionary functions. For example, she claims that the District "fail[ed] to use reasonable care in providing training consistent with local and national standards." ECF 9 ¶ 202. Read in the context of her complaint, it is not entirely clear whether Ms. Alston is challenging (a) policy

decisions the District made in designing MPD training programs (discretionary actions), or (b) District employees' alleged failure to conform to the District's own local standards (which could be a ministerial action). Because option (b) is a plausible reading of the complaint and the Court must draw all reasonable inferences in Ms. Alston's favor at this early stage, the Court will allow Counts 19–22 to proceed to discovery. Indeed, in *Carter*, the D.C. Circuit found it was error for the district court to dismiss negligent supervision claims at the motion-to-dismiss stage where the record "d[id] not disclose the precise character of [Defendants'] supervisory functions" and it was therefore "impossible to determine whether the District is immune to suit" with respect to those functions. 447 F.2d at 367. Of course, discovery may reveal that the actions Ms. Alston challenges are properly considered discretionary rather than ministerial—but on the facts alleged here, the Court cannot say that that is the case.

Because Ms. Alston has plausibly alleged negligent supervision, retention, and training claims that are not—at this early stage—conclusively barred by sovereign immunity, Counts 19–22 may proceed to discovery as against the District.

### C. Claims on Behalf of Ms. Alston (Counts 16 and 18)

Ms. Alston advances two claims on her own behalf under the Wrongful Death Act. She brings an IIED claim (Count 16) against the District and the unidentified employees who interacted with her after Mr. Alston's death, alleging that they caused her severe emotional distress "through [their] gross disregard for her well-being in the days and two years following her son's death." ECF 9 ¶¶ 162–72; *see* ECF 25 at 39–40. She also brings an NIED claim against the District (Count 18), alleging that MPD negligently inflicted emotional distress upon her by shooting and killing her son. *Id.* ¶¶ 182–87. The Court concludes that both claims against the District are barred

39

for failure to comply with the notice requirements of D.C. Code § 12-309, and that Ms. Alston fails to state an IIED claim against Officers Koch and Demeritt.

> **1.    Ms. Alston's IIED and NIED claims against the District are barred for failure to comply with D.C. Code § 12-309**

To bring a personal injury claim against the District of Columbia, a plaintiff must—within six months of the injury—"give[] notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury." D.C. Code § 12-309(a). "[N]otice under § 12-309 is a condition precedent to filing suit." *Barnhardt v. District of Columbia*, 8 A.3d 1206, 1212 (D.C. 2010). A notice is sufficient if it "describe[s] the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability." *Doe by Fein v. District of Columbia*, 697 A.2d 23, 27 (D.C. 1997) (quoting *Washington v. District of Columbia*, 429 A.2d 1362, 1366 (D.C. 1981) (en banc)). Courts interpret the content of such a notice "liberally" and "in close cases [will] resolve doubts in favor of finding compliance with the statute." *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C. 1995).

The complaint states that, "[o]n November 30, 2018, Ms. Alston issued formal notice to D.C. Mayor Muriel Bowser that she would be pursuing claims on behalf of her son's death pursuant to D.C. Code, Section 12-309." ECF 9 ¶ 7. The District claims that Ms. Alston's IIED and NIED claims fall outside the scope of this notice, for two reasons. First, it contends that Ms. Alston's letter only put the District on notice of potential claims brought by Ms. Alston on her son's behalf—not of claims brought by Ms. Alston in her personal capacity. ECF 32 at 33. The Court is not persuaded. Section 12-309 only requires a tort plaintiff to state the "time, place, cause, and circumstances of the injury"; it does not require a plaintiff to enumerate the legal consequences, or potential causes of action, that could arise from that injury. D.C. Code § 12-309; *see Tibbs v. Williams*, 263 F. Supp. 2d 39, 44 (D.D.C. 2003) (finding that "the District of Columbia

was fairly on notice of its potential liability and its connection to Mr. Tibbs's injury," even though the various "legal consequences of these actions were described with less specificity"). According to the allegations in her complaint, Ms. Alston notified the District of the injury underlying any future claims: her son's death. ECF 9 ¶ 7. Given the D.C. Court of Appeals' guidance to interpret the content of Section 12-309 notices "liberally" and "resolve doubts in favor of finding compliance with the statute," the Court finds that Ms. Alston's description of her November 2018 letter in her complaint sufficiently notified the District that she would bring tort claims arising from Mr. Alston's death—whether on his behalf or her own.[19] *Wharton*, 666 A.2d at 1230.

But the District makes a second argument, which the Court does find persuasive: Ms. Alston did not notify the District of any claims arising from her interactions with MPD *after* the shooting. Her IIED claim (Count 16) alleges that Defendants "intentionally or recklessly caused Ms. Alston to suffer severe emotional distress" by failing to notify her of her son's death, behaving in a "curt and thoughtless" manner when they did notify her, and limiting her ability to view (and the circumstances under which she could view) BWC footage. ECF 9 ¶¶ 163–72. These alleged tortious actions are distinct in "time, place, cause, and circumstances" from the injury alleged in Ms. Alston's Section 12-309 notice—her son's death. In fact, some of these events took

---

[19] In her opposition, Ms. Alston clarifies that her notice stated: "[w]e plan to pursue any and all legal claims that Kenithia Alston and the Estate of Marqueese Alston have *as a result of* the incident on June 12, 2018." ECF 22 at 23 (emphasis in original). Defendants argue that the Court should not consider this language because it did not appear in the complaint. *See* ECF 27 at 20. But, at minimum, Ms. Alston's notice to the District is incorporated in the complaint—she specifically refers to the letter that she sent to the District. *See* ECF 9 ¶ 7. So, the Court could consider the language of her notice, *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624, were the notice itself before the Court— something courts do frequently in the administrative exhaustion context. *See Vasser v. McDonald*, 228 F. Supp. 3d 1, 9–10 (D.D.C. 2016) ("In the context of exhaustion, courts are willing to rely upon administrative orders and administrative complaints without converting the motion into one for summary judgment when the documents are referred to in the complaint, . . . are integral to [the plaintiff's] exhaustion of administrative remedies . . . ."). But even limiting its analysis to the complaint's allegations, the Court finds that the November 2018 letter put the District on notice that Ms. Alston might bring claims on her own behalf, not just the estate's behalf.

place after Ms. Alston submitted her letter to the Mayor in November 2018.[20] *See, e.g., id.* ¶ 168 (discussing actions MPD took in August 2019). Because Ms. Alston did not put the District on notice of any injuries she incurred after Mr. Alston was shot, her IIED claim (Count 16) must be dismissed as against the District.

Ms. Alston's NIED claim (Count 18) suffers from the same problem. She alleges that MPD negligently inflicted emotional distress upon her "by unlawfully shooting her beloved son and callously refusing to release information about the killing in an expedient or accountable manner." ECF 9 ¶ 183. However, Ms. Alston's opposition makes clear that her NIED claim arises solely from events that took place after officers shot her son. She contends that, "[w]hen someone dies at the hand of the government, the government . . . has a duty to their next of kin to not inflict emotional distress," and that MPD breached that duty in its dealings with Ms. Alston after her son's death. ECF 22 at 26. But as explained above, based on the information before the Court, Ms. Alston's interactions with MPD after her son's death fall outside the scope of her Section 12-309 notice. Because Ms. Alston did not put the District on notice of the injuries alleged in Count 18, that claim must also be dismissed.

### 2.    Ms. Alston does not plausibly allege an IIED claim against Officers Koch and Demeritt

Ms. Alston also brings her personal capacity IIED claim (Count 16) against Defendant Officers, contending that the MPD representatives who visited her home the day after the shooting treated her poorly. ECF 9 ¶¶ 162–72. Because she sues these officers in their individual capacities, *see id.* ¶ 9, Section 12-309 does not apply. *See Mpoy v. Fenty*, 870 F. Supp. 2d 173, 180

---

[20] Ms. Alston alleges that she "again notified D.C. Mayor Bowser on April 15, 2020 to restate her intention of filing a claim against the District on behalf of her son's estate." ECF 9 ¶ 7. However, she includes no further information about that notice, and says nothing to suggest that the April 2020 notice mentioned the District's post-shooting conduct. If, in fact, Ms. Alston did provide notice to the District that she intended to bring claims against it related to interactions she had with officers after Mr. Alston's shooting, she is free to submit that information to the Court and request reconsideration of this ruling.

(D.D.C. 2012); D.C. Code § 12-309 ("[A]n action may not be maintained against the District of Columbia . . .").

It is unclear whether the MPD representatives who visited Ms. Alston's home were Officers Koch and Demeritt, Officers Z and A (Koch and Demeritt's supervisors), or someone else entirely. *Compare* ECF 9 ¶ 163 (alleging that District "agents and employees including Officers Z and A" intentionally or recklessly caused Plaintiff severe emotional distress, and making no allegations about Officers X and Y), *with* ECF 31 at 35–36 (arguing that "[t]here is no showing that Officers Demeritt or Koch had any conversation with [Ms.] Alston after the June 12, 20[1]8 shooting" and they "would not have been responsible for notifying her of M[r]. Alston's death"). However, Ms. Alston contends in her opposition that the Court should nonetheless decide whether she has stated an IIED claim against Officers Koch and Demeritt because "[a]t this stage of litigation, the identity of the officers who interacted with Ms. Alston are unknown." ECF 25 at 40. The Court will therefore draw all reasonable inferences in Ms. Alston's favor and assume that the "agents and employees" of the District who interacted with her the day after the shooting could have been Officers Koch and Demeritt (although it seems odd that the officers involved in the shooting would be the ones to provide such notification). However, as explained below, the Court concludes that Ms. Alston has failed to state an IIED claim against them.

The bulk of Count 16 takes issue with the District's conduct (which the Court has already addressed above), not any particular officer's conduct. Ms. Alston's sole factual allegation about the officers who interacted with her is that they were "curt and thoughtless" in notifying her of her son's death. *Id.* ¶ 164. Specifically, she alleges that the following occurred:

> When MPD representatives finally came to Ms. Alston's home the day following the shooting, the representatives told Ms. Alston that they were there regarding an "incident" that had occurred the day before. The MPD representatives then asked Ms. Alston if she had

> any questions, handed her a printout from Google with the DC
> medical examiner's contact information and a business card of a
> sergeant in Internal Affairs, and apathetically offered an "I extend
> my condolences." Throughout this interaction, MPD never told Ms.
> Alston that her son Mr. Alston had been killed by MPD Officers.

*Id.* ¶ 26. These allegations, standing alone, are insufficient to allege IIED—a tort limited to conduct

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010) (quoting *Bernstein v. Fernandez*,

649 A.2d 1064, 1075 (D.C. 1991)). Even "insults, indignities, [and] threats" do not clear this high

bar. *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (quoting Restatement (Second) of

Torts § 46 cmt. d (1965)). Ms. Alston argues that she was particularly susceptible to emotional

distress given the trauma of losing her child, and "[a]cts which are not generally considered

outrageous may become so when the actor knows that the other person is peculiarly susceptible to

emotional distress." ECF 25 at 39; *Drejza v. Vaccaro*, 650 A.2d 1308, 1313 (D.C. 1994) (quoting

*District of Columbia v. Thompson*, 570 A.2d 277, 291 (D.C. 1990), *opinion vacated in part on

reh'g*, 593 A.2d 621 (D.C. 1991)). But the conduct alleged here—behaving apathetically and

unsympathetically toward Ms. Alston—still does not rise to the level of conduct held to be extreme

and outrageous, even considering that Ms. Alston may have been susceptible to emotional distress.

*Cf. Drejza*, 650 A.2d at 1309–10 (allowing IIED claim to go forward where police officer

"ridiculed," "bullied," and "snickered" at rape victim while taking her statement); *Mann v. Bahi*,

242 F. Supp. 3d 6, 12 (D.D.C. 2017) (allowing IIED claim to go forward where nurse hired to care

for "a frail and vulnerable elderly couple" broke into their bedroom at night, stole their possessions,

and told the victim to be thankful for the theft). Count 16 is therefore dismissed as to Officers

Koch and Demeritt.

None of this is to say that Ms. Alston did not suffer, or that the Court condones MPD's alleged conduct. The law sets an extremely high bar for IIED and a complaint must include allegations that, if proven, would meet the requirements of the claim. *See Drejza*, 650 A.2d at 1312 ("The requirement of outrageousness is not an easy one to meet."). Falling below that bar does not negate the trauma and emotional distress that Ms. Alston alleges she experienced, but the Court finds that her complaint does not state a plausible claim for IIED.

### D. Punitive Damages Against the District

Ms. Alston seeks both compensatory and punitive damages. ECF 9 at 44. The parties agree that punitive damages are available against the District only in "extraordinary circumstances," such as "a case where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question." *See* ECF 32 at 36; ECF 22 at 35; *Daskalea v. District of Columbia*, 227 F.3d 433, 446–47 (D.C. Cir. 2000). Because Ms. Alston has plausibly alleged that such a policy led to her son's death, *see supra* Part III.A.3., the Court finds that it would be premature to dismiss her punitive damages claim before discovery. *See Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 265 (D.D.C. 2010) (concluding that it would be premature to dismiss punitive damages claim before discovery, where plaintiff alleged that MPD had a policy of swerving into motorcycle lanes to intimidate young motorists).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, ECF 31 and 32, are **GRANTED IN PART** and **DENIED IN PART**. The following claims remain before the Court:

- Fourth Amendment claims (Counts 1–4)

- *Monell* claims, as to the District's alleged policy or custom of using jump-outs (Counts 7–8)

- Assault and battery claims brought under the Wrongful Death Act (Counts 11 and 13)

- Negligent infliction of emotional distress claim, on behalf of Mr. Alston (Count 17)

- Negligent supervision, retention, and training claims against the District (Counts 19–22)

- Negligent use of force and negligent failure to render aid claims, on behalf of Mr. Alston (Counts 23–24)

**SO ORDERED.**

_____

JIA M. COBB
United States District Judge

Date: March 24, 2025